**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WG WOODMERE LLC; SG BARICK LLC; and LH BARICK LLC, | ) ) ) Civil Action No.: 2:23-cv-6966 |
| Plaintiffs, | ) ) ) |
| vs. | ) ) ) **COMPLAINT AND** |
| THE INCORPORATED VILLAGE OF WOODSBURGH; and THE INCOPORATED VILLAGE OF LAWRENCE, | ) **DEMAND FOR JURY TRIAL** ) ) ) ) |
| Defendants. | ) ) ) |

Plaintiffs WG Woodmere LLC, SG Barick LLC and LH Barick LLC (collectively "Plaintiffs") for their Complaint against defendants the Incorporated Village of Woodsburgh ("Woodsburgh") and the Incorporated Village of Lawrence ("Lawrence," and together with Woodsburgh, the "Defendants" or the "Villages") allege as follows:

**NATURE OF THE ACTION**

1.       This action arises from the coordinated and unlawful attempt by Defendants and non-party the Town of Hempstead ("Hempstead" or the "Town," and together with the Defendants, the "Municipalities")[1] to cloak the wolf of eminent domain in the sheep's clothing of "zoning" and through that scheme to take Plaintiffs' property (the "Property") through a jointly-adopted

---

[1] Hempstead was a named-defendant in Plaintiffs' prior action entitled *WG Woodmere LLC et al v. Town of Hempstead et* al, 2:20-cv-03903-ARR-AYS.  On December 1, 2022, this Court (Ross, J.) dismissed that action for lack of finality, finding that Plaintiffs needed to first submit a more modest subdivision application and/or apply for variances in order for their claims against the Villages and the Town to ripen.  *See* ECF No. 77.  As set forth in more detail below, since then, Plaintiffs have both submitted an application for a more modest subdivision plan and have also submitted applications for use variances to Defendants and the Town. Defendants' actions on Plaintiffs' zoning applications pending within their respective jurisdictions are described in detail below. Plaintiffs' zoning application to the Town has been processed and is awaiting the assignment of a date for a public hearing.   Accordingly, Plaintiffs reserve the right to amend the complaint in this action to add the Town as a defendant should the Town either refuse to hear or deny Plaintiffs' variance application.

1

new "zoning" classification titled "Coastal Conservation District - Woodmere Club" in violation of the United States Constitution, the New York State Constitution and other provisions of Federal and New York State Law.

2.     The new restrictive "zoning" ordinance applies solely to Plaintiffs' Property, which is known as the "Woodmere Club," a private former golf club located on approximately 118 acres of land situated partially within each of the three Municipalities. Plaintiffs purchased the Property in 2017.  Based on the long-standing residential zoning of the Property, and the similarly zoned and developed land surrounding the Property, Plaintiffs legitimately believed that they would be able to develop their Property in the same manner as the surrounding properties and in the manner in which it had long been zoned.  That was their distinct investment-backed expectation in purchasing the Property.

3.     Defendants' and the Town's ploy to target only Plaintiffs and their Property – and no other similarly situated property – is starkly apparent by the name of the new zone: the "Coastal Conservation District – Woodmere Club" zone.

4.     Under the zoning that was in effect for more than sixty years until Defendants and the Town enacted their new "zoning," Plaintiffs were permitted to develop 284 lots for single family homes on the Property as-of-right.  However, on June 29, 2020 and July 1, 2020, as the last step in their concerted machinations, the Town of Hempstead, the Village of Woodsburgh, and the Village of Lawrence each voted to enact the "Coastal Conservation District – Woodmere Club" zone.

5.     The newly enacted "zoning" dramatically reduced the permitted density on the Property from the previously permitted 284 single family residential lots to just 59, a loss of approximately 80%, or 255 lots.  In addition, it also correspondingly takes away Plaintiffs' ability

to develop 80% of the acreage that Plaintiffs formerly had the right to develop. Defendants and the Town further designated 95% of that reduction to be set aside as "parkland" on which all building and other economically productive uses of any kind are prohibited, effectively exacting a conservation easement on Plaintiffs' Property.

6. As for the few token lots Defendants and the Town theoretically permitted Plaintiffs to develop under the new zone as a fig leaf to cover their naked land grab – a tiny fraction of what Plaintiffs had the right to do before – that gesture is wholly illusory. Defendants and the Town intentionally imposed onerous and burdensome conditions and restrictions in their new zone that will triple the cost to develop these few lots, thus vitiating their economic viability. These punitive changes rendered illusory any supposed "value" left for Plaintiffs because what is left for them is not an economically productive use and is not consistent with Plaintiffs' reasonable, investment-backed expectations when they purchased the Property. Indeed, although some theoretical or paper "use" remains for the Property, that use is not "economically productive" because (as alleged in more detail below) after the rezoning the portions of the property available for development will cost more to develop than can be recouped from sale. Additionally, as alleged above, under the new zoning, Plaintiffs must leave a significant part of the Property vacant and unused as recreational space for the community. Moreover, Plaintiffs would be required to install – and maintain – flood control measures and equipment on their Property for the benefit of the surrounding properties, all of which increases the cost to develop what remains of the Property and is of no benefit to the Property or to Plaintiffs.

7. Defendants and the Town hurriedly enacted their new "Coastal Conservation District – Woodmere Club" zone as a last-ditch effort to pull the rug out from under Plaintiffs,

3

who were two years into the subdivision approval process, under which Plaintiffs sought permission to subdivide the Property into 284 as-of-right-zoning-compliant building lots.

8.      Notably, Defendants and the Town enacted their new "Coastal Conservation District – Woodmere Club" zone only after they tried, unsuccessfully, for years, other gambits to severely limit or completely bar any development on the Property.  In each of these governmental efforts, they had been stopped by either the courts or their own constituents from doing so. Frustration with Plaintiffs' insistence on pursuing their long-standing development rights caused the Municipalities to adopt the new zoning – more restrictive than that recommended by their own consultant when that consultant recommended zoning changes – to punish Plaintiffs for trying to do so.

9.      Defendants' first tactic to stymie any development on the Property, and delay Plaintiffs, was to institute temporary moratoria that immediately prevented development. Hempstead did so first, followed by Woodsburgh. These moratoria expressly said that they were delaying any and all development so that the Municipalities could study methods of preserving community character.  They made no mention of environmental, traffic or other concerns to which the Municipalities now point as justification for their latest actions. This highlights the Municipalities' true motives behind their actions; *i.e.,* to find any way possible to prohibit as much development as possible for as long as possible, and to prevent Plaintiffs from adding any lots for single family homes to the area despite soaring need and demand, and without any legitimate legislative public purpose.

10.      In Nassau County, the Nassau County Planning Commission (the "NCPC") is the body with authority to review and approve subdivision applications for land within the jurisdiction of the Town of Hempstead.  However, under the NCPC's rules, an applicant for subdivision

4

approval must demonstrate to the NCPC that its proposed building lots either comply with the applicable local zoning regulations – *i.e.,* the applicable zoning within the Town and Villages – or that it has secured variances from such regulations.

11. During the two years in which the moratoria were in effect, Plaintiffs could not prosecute the subdivision application necessary for the development of the Property because Plaintiffs did not know if, when, or how Hempstead and the Defendants would alter the zoning regulations applicable to the Property, and Plaintiffs were therefore unable to demonstrate to the NCPC that Plaintiffs' plan complied with the local zoning. Thus, by enacting their moratoria, Hempstead and Woodsburgh effectively suspended the zoning regulations governing the Property with the expectation that, at the expiration of the moratoria, these Municipalities would alter the zoning requirements and, as Defendants and the Town intended, until Plaintiffs knew the parameters of the underlying zoning regulations that would apply to the Property, they could not develop or even file an application for subdivision approval with the NCPC.

12. Plaintiffs were left to endure the suspension of their development rights for the almost two years in which the moratoria were in effect. Yet, while Plaintiffs' property rights were suspended, Hempstead and Woodsburgh used the moratoria period to produce exactly nothing – neither municipality availed itself of the opportunity to study zoning changes that could appropriately guide development of the Property and neither adopted any zoning amendments during, or immediately following, the moratoria.

13. Plaintiffs were compelled eventually to commence an action against Hempstead in New York State Court, in which the Court struck down Hempstead's Moratorium as unconstitutional, illegal, and enacted for no valid purpose. As a result, shortly thereafter, Woodsburgh settled Plaintiffs' suit about Woodsburgh's "copy-cat" moratorium.

5

14.     In sum, despite the stated purpose behind the moratoria (to study methods of preserving community character), Defendants and the Town conducted no studies, showing that their only purpose was to delay Plaintiffs for as long as possible from pursuing their lawful, "as of right" development of the Property.  They did this by using the moratoria as a tactic to delay – indeed, temporarily prevent – Plaintiffs from being able to pursue their subdivision application at the NCPC by throwing the Defendants' and the Town's zoning regulations into question.  That made it practically impossible for Plaintiffs to fashion a zoning-compliant subdivision plan that they could submit to the NCPC. The illegal moratoria by themselves (and in addition to the impact of the eventual "rezoning" discussed hereafter) succeeded in delaying Plaintiffs' development plans for two years.

15.     Defendants and the Town followed the moratoria by proposing a new "down-zoning" plan in 2018 ("Proposed 2018 Golf Course Zone"), which would have reduced the as-of-right density of the Property's then applicable zoning by 60%; from 284 to only 125 lots. The same engineering firm that prepared the study to support the "Coastal Conservation District – Woodmere Club" zone at issue here, prepared the study upon which the Town relied to support its Proposed 2018 Golf Course Zone.

16.     However, the 5 Towns Civic Association ("5TCA"), a local citizens' organization, adopted a name making it sound as though its interests expansively covered all events in "5 Towns."  Nonetheless, its sole raison d'être (according to its own website) is to block all development on this Property and nothing else.  The 5TCA insisted that Defendants and the Town must act to prevent even a single home from being built on the Property and were loudly opposed to any development whatsoever.

17.    Faced with pressure from the 5TCA, extensive public criticism and an outpouring of negative comments on the Proposed 2018 Golf Course Zone from other local residents, the Municipalities' politicians ultimately withdrew the Proposed 2018 Golf Course Zone, proving that the intention of the entire rezoning proposal was just meant to pacify the public and was not steeped in sound environmental, traffic and engineering analysis.

18.    The Proposed 2018 Golf Course Zone, while dramatically reducing the number of lots permitted as-of-right under the then existing zoning, still would have allowed more than twice as many lots as the Defendants and the Town ultimately permitted.

19.    After Defendants' and the Town's failed attempt to adopt the Proposed 2018 Golf Course Zone, local officials and politicians further succumbed to public pressure by attempting to make the entire golf course a local private park for residents by taking it through their eminent domain powers. The politicians polled local residents, via survey, to discover if the taxpayers would agree to pay the increased property taxes necessary to fund a plan to buy Plaintiffs' Property for parkland.  The residents overwhelmingly rejected the notion of paying higher taxes to purchase the Property for their own private park.

20.    Only after the local politicians failed to convince taxpayers to agree to purchase the Property and create a park through eminent domain did the Defendants and the Town adopt the newly concocted "Coastal Conservation District – Woodmere Club" zone with its designation of approximately 71% of the Property as parkland.  By doing so, Defendants and the Town have simply repackaged their eminent domain parkland idea, called it "rezoning," and then used that transparent ruse as an end-around the Constitutional requirement to pay compensation for the Property.  Neither the law, nor logic, nor sound public policy, permit such a charade.

7

21.     Thus, through their series of actions set forth above, as well as the multiple statements by Defendants' and the Town's representatives saying that Defendants' and the Town's goal was to restrict all development on the Property, or as close to all as they could get away with, Defendants and the Town committed themselves to their position; *i.e,,* that the maximum number of lots they will permit Plaintiffs to develop on the Property is 59, and only in the areas Defendants and the Town designated on the map they created to pre-plan the development of the Property.[2]

22.     While all of that was taking place, Plaintiffs proceeded with the review of their proposed 284-lot subdivision plan before the NCPC, which included a review under New York State's Environmental Quality Review Act ("SEQRA").  After the moratoria were defeated, the zoning remained as it had been for sixty years and Plaintiffs proceeded with development plans accordingly.

23.     By the time Defendants and the Town enacted their "Coastal Conservation District – Woodmere Club" zone Plaintiffs had already completed a substantial part of the SEQRA review process, having spent almost two years and nearly $2 million dollars on fees, plans and studies, including the completion of a full draft environmental impact statement ("DEIS") that analyzed the environmental consequences of each and every component of the project pursuant to the mandates of SEQRA.

24.     The NCPC deemed the DEIS complete on May 14, 2020 and, at that time, published the DEIS for review by Defendants and the Town as "involved agencies" and for comment by the public.

---

[2]     Due to engineering issues, although Defendants claim that they have permitted 59 lots, the maximum number of lots actually available for development in the areas permitted by the "Coastal Conservation District – Woodmere Club" zone is just 54.

25. Although the Defendants and the Town were involved agencies by law, they declined at any point during that almost two-year process, to exercise their rights to participate substantively in the SEQRA review at the NCPC and had intentionally delayed in taking any action on Plaintiffs' applications. As the matters under consideration by the NCPC directly involved the Municipalities, the SEQRA process anticipates their participation. As the SEQRA Handbook puts it, "All involved agencies are encouraged to submit comments during the coordination period. Comments that deal with an agency's specific area of interest or jurisdiction are especially appropriate." 4th ed., p. 63. Yet the Defendants and the Town did nothing.

26. Instead of participating, as soon as the NCPC deemed the DEIS complete, Defendants hurriedly voted, in late June and early July 2020, to enact their new "Coastal Conservation District – Woodmere Club" zone.

27. Remarkably, as stated above, this new "Coastal Conservation District – Woodmere Club" zone was formulated for the Municipalities by the same engineering firm that created the Proposed 2018 Golf Course Zone, which concluded that 125 lots for single family homes on the Property would be appropriate.

28. But, unlike the Proposed 2018 Golf Course Zone, which would already have been extremely restrictive, the "Coastal Conservation District – Woodmere Club" zone included significant additional restrictions, including: a parkland requirement; setting aside significant property for supposed public flooding mitigation; and designating a specific subdistrict in which Plaintiffs were restricted to using the land solely for an existing clubhouse, or an identical structure in size and footprint.

29. Indeed, only after needing to manufacture and offer a purportedly legitimate purpose for taking Plaintiffs' private land through zoning did the Defendants' and the Town's

engineering firm "discover" that the Defendants supposedly needed to protect their voters by enacting a "conservation district" that would effectively create a park specifically for the adjacent residents (not even the general public) on more than 80 acres of Plaintiffs' private property.

30.    Thus, through the "Coastal Conservation District – Woodmere Club" zone, the Municipalities have enacted an improper regulatory land grab to accomplish indirectly the same ends they were unable to accomplish lawfully, *i.e.* by using their eminent domain powers and paying constitutionally compelled just compensation to Plaintiffs. The Municipalities had at least a general idea of the financial scope of what they were doing, as they told the Property's neighbors that it would cost each of them $2,000 to $4,000 per property each year for the next 20 years. Upon information and belief, the Town sent a survey to property owners who would have been subject to a new "park district tax" used to fund the acquisition of the Property asking whether they would be willing to pay such a tax. The survey went out to thousands of residents in the area around the Property.  Multiplied out, the total value of the property (and thus the cost to the Defendants and the Town of taking it formally) was obviously substantial.  Commensurately, the cost to Plaintiffs of having the Property taken by zoning it out of productive use would be a similar number.

**The New Zoning Is an Unconstitutional Taking of Property Without Compensation**

31.    Defendants' and the Town's newly adopted "Coastal Conservation District – Woodmere Club" zone has left Plaintiffs with not a single lot to develop in the Village of Lawrence – compared to the zoning in place when Plaintiffs purchased the Property which allowed 12 buildable lots; a 100% "categorical," *per se* taking of Plaintiffs' Property within that village per the United States Supreme Court's decision in *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003 (1992), or, in the alternative, a taking under the United States Supreme Court's seminal decision in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978).

10

32.      In Hempstead, the new ordinance reduces the number of lots that Plaintiffs can develop to 41 – compared to the zoning in place when Plaintiffs purchased the Property which allowed 248 buildable lots; a reduction of more than 83%, or 207 lots.  Such a significant taking is unconstitutional under *Penn Central*.

33.      In Woodsburgh, the new ordinance reduces the number of lots that Plaintiffs can develop to 18 – compared to the zoning in place when Plaintiffs purchased the Property which allowed 24 buildable lots; a reduction of 25%.  Woodsburgh's ordinance constitutes an unconstitutional taking under *Penn Central.*

34.      All told, the combined and concerted actions of the Municipalities have destroyed Plaintiffs' distinct and legitimate investment-backed expectations for development when they purchased the Property.

**The New Zone Places Unconstitutional Conditions on Plaintiffs' Property**

35.      Through the "Coastal Conservation District – Woodmere Club" zone the Municipalities have taken Plaintiffs' ability to develop 80% of the acreage that Plaintiffs formerly had the right to develop.  Defendants and the Town further designated 95% of that reduction to be set aside as "parkland" which Plaintiffs must leave as open space.  That action exacts a conservation easement over the Property.  Under the new zone, Plaintiffs are also required to install costly drainage and flood mitigation improvements – not for the Plaintiffs' benefit, but rather, for the benefit of the surrounding neighbors – solely at Plaintiffs' cost and expense, and to keep and maintain such equipment on their own Property at all times.

36.      Plaintiffs will have to expend vast quantities of money annually to maintain approximately 80 acres of parkland, drainage and flood mitigation for the benefit of the

11

surrounding neighbors, in perpetuity as a condition for making *any* use of the remaining Property, albeit use that is economically unproductive.

37.    This exaction of these easements on the Plaintiffs' Property solely for the benefit of the neighbors, along with putting the financial responsibility for maintaining them solely on Plaintiffs, constitute unconstitutional exactions under the seminal decisions *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987), *Dolan v. City of Tigard*, 512 U.S. 374 (1994), and *Koontz v. St. Johns River Water Management District*, 133 S. Ct. 420 (2013).

**The New Zoning Violates Plaintiffs' Equal Protection Rights**

38.    The rezoning, as is evident from its name: the "Coastal Conservation District – Woodmere Club" zone, improperly singles out Plaintiffs' Property (and Plaintiffs alone), among all other similarly situated properties in the Municipalities, for onerous, burdensome, harsh, and restrictive treatment.

39.    There are at least four other golf courses near Plaintiffs' Property that also are located within flood zones.  All four, like Plaintiffs' Property, were operating as golf courses and country clubs when the Defendants and the Town adopted their new zoning.  All of them were in zones comparable to the Property under which those golf course properties could have been developed for single family residential lots as of right.  No golf course property other than Plaintiffs', however, had its zoning changed.

40.    Moreover, there are approximately 42,000 parcels (14,000 acres) of land that sit within flood zones in the Municipalities.  However, the "Coastal Conservation – Woodmere Club" zone only applies to the 12 parcels (approximately 118 acres) that sit exclusively on Plaintiffs' Property and in Plaintiffs' ownership and to no other.  Attached hereto as **Exhibit A**, is a true and correct copy of a map evidencing the flood plain and coastal boundaries within the Municipalities.

41.     Further, although the Municipalities have advanced the new argument that flood mitigation purportedly mandates the new zone at issue in this case, the Municipalities have not changed zoning ordinances (aside from the new zone targeting solely Plaintiffs' Property) for the remaining 99% of the 14,000 acres in flood zones for flood mitigation purposes.  *See* Exhibit A.

42.      Additionally, contrary to its supposed concerns about building in flood zones, the Village of Lawrence owns a parcel of its own in a flood zone and near an evacuation route. Lawrence is actively working to rezone this property to allow for future residential development (with a density more than 10 times that of the Plaintiffs' proposed development on Plaintiffs' Property).  Lawrence also owns a golf course less than a mile away from the Property which is also in a flood zone.  That property, however, is not subject to flood mitigation.  To the contrary, Lawrence is currently considering permitting further development on its own golf course property by allowing the installation of a building that would house an eight million dollar indoor pool and swimming facility.

43.     At the very same time the Town of Hempstead was thwarting development of Plaintiffs' Property, it was also pushing through rezoning of an area near the Property that will permit significantly greater density and traffic issues, including by allowing 19,500 square feet of commercial development and a new 336-unit residential apartment building.  This new development district is already in an area much more concentrated and congested than the area surrounding Plaintiffs' proposed subdivision, which consists solely of single-family residences. Although the Defendants and the Town point to the supposed traffic and other issues that would preclude the density of the previously as-of-right development of the Property, somehow these same concerns and issues are not applied to their own projects (for which they did not even commission a traffic study).

44.     In addition, in the "Coastal Conservation District – Woodmere Club" zone, the Defendants and the Town have mandated certain restrictive building requirements (such as the use of permeable pavers) and stormwater retention regulations, that apply only to the 59 lots that the Municipalities will theoretically allow Plaintiffs to build on the Property.  Yet, more than 99% of the approximately 42,000 land parcels (approximately 14,000 acres) within the Municipalities that also sit within the same flood zone are not required to employ the same supposedly critical – and expensive – construction methods and flood mitigation techniques for construction on their properties.

45.     Moreover, and shamefully, Defendants and the Town have given their official imprimatur to illegal discrimination – linking on their webpages to letters containing ugly sentiments that unlawfully single out Plaintiffs for unfair treatment through the adoption of the new zone based on abhorrent anti-Semitic stereotyping and that target Plaintiffs' principals as "money grubbing," "greedy" out-of-state interlopers, demonstrating that Defendants and the Town have improperly singled out Plaintiffs for disparate treatment for illegal purposes.

**Under Well Settled New York Law the Defendants and the Town**
**Lack the Power to Have Adopted the New Zoning**

46.     In addition to also being unconstitutional under New York State's Constitutional provisions that correspond to the United States' Constitutional provisions noted above, in adopting their new zoning ordinance, the Municipalities also violated New York law in improperly purporting to use their zoning power (the right to establish criteria for an area consisting of several properties, consistent with a plan) to accomplish planning objectives (the right to consider how a single property is to be developed).  In Nassau County, pursuant to the Nassau County Charter, the NCPC has jurisdiction over applications for the subdivision of land that lies within

14

unincorporated areas of the County (i.e. townships) and over certain applications that pertain to land that lies within an incorporated village or city.

47.     The rezoning therefore must also be invalidated, *inter alia*, under well settled New York law as an improper and *ultra vires* use of the zoning power by Defendants and the Town to enact measures that are soundly and exclusively within the sole ambit of the NCPC.

48.     Indeed, Hempstead is a persistent repeat offender of the improper use of zoning power and is well aware that its actions in this instance are illegitimate.  The Town has already tried to enact this sort of planning through the improper use of the zoning power directed to a single property and property owner, an effort that New York's Appellate Division, Second Department invalidated for this precise reason in *BLF Assocs., LLC v. Town of Hempstead*, 59 A.D.3d 51, 870 N.Y.S.2d 422 (N.Y. App. Div. 2008).

*            *            *

49.     Plaintiffs are in the business of developing real property, not of litigation.  However by colluding with each other for years to deprive Plaintiffs of their rights, Defendants and the Town have forced Plaintiffs to endure years of litigation to enforce their rights, first in the New York State Courts – which expressly found that the Town engaged in unconstitutional conduct that delayed Plaintiffs and deprived them of their constitutional rights – and now in this action. Defendants and the Town have always had the option of acting in a lawful manner but have repeatedly refused to do so.

50.     Defendants' and the Town's conduct has damaged, and continues to damage Plaintiffs, who are bringing this action to invalidate the ordinance as an unconstitutional taking, imposition of unconstitutional conditions, for inverse condemnation compensation and compensation resulting from their inability to use and enjoy their Property as set forth in *First*

15

*English Evangelical Lutheran Church v. Los Angeles County*, 482 U.S. 304 (1987), as well as their attorneys' fees and costs pursuant to 42 U.S.C. §1988.

51.     Plaintiffs' economic loss, just from the lost lots that were previously available to them as-of-right, as a result of the adoption of the "Coastal Conservation District – Woodmere Club" zone, and for which the Defendants are jointly and severally liable, amounts to at least $65 million dollars resulting from the loss of value in each of the Defendants as follows:

a.   at least $25 million dollars in the Village of Lawrence; and

b.   at least $40 million dollars in the Village of Woodsburgh.

## JURISDICTION AND VENUE

52.     This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as it arises under the Constitution and laws of the United States and presents a federal question, and pursuant to 28 U.S.C. § 1343(a)(4) in that it seeks to secure equitable, monetary, and other relief under an Act of Congress, specifically 42 U.S.C. § 1983.

53.     This Court has supplemental jurisdiction over Plaintiffs' New York State law claims pursuant to 28 U.S.C. § 1367.

54.     This Court is authorized to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rules of Civil Procedure 57 and 65.

55.     Venue is proper within this judicial district, pursuant to 28 U.S.C. § 1391(b), because the relevant events giving rise to Plaintiffs' claims have occurred in this judicial district.

## PARTIES

56.     Plaintiff WG Woodmere LLC is a limited liability company with its principal place of business located at 41 Bayard Street, New Brunswick, New Jersey 08901.

16

57. Plaintiff SG Barick LLC is a limited liability company with its principal place of business located at 1450 Broadway, 40th Floor, New York, New York 10018.

58. Plaintiff LH Barick LLC is a domestic limited liability company with its principal place of business located 1450 Broadway, 40th Floor, New York, New York 10018.

59. Defendant Woodsburgh is a municipality organized under the laws of the State of New York, and located within Nassau County, New York. Woodsburgh is governed by a Mayor and Board of Trustees.

60. Defendant Lawrence is a municipality organized under the laws of the State of New York, and located within Nassau County, New York. Lawrence is governed by a Mayor and Board of Trustees.

## RELEVANT NON-PARTIES

### The Town of Hempstead

61. The Town of Hempstead is a municipality organized under the laws of the State of New York, located within Nassau County, New York. The Town is governed by a Supervisor and Town Board.

### The Nassau County Planning Commission

62. The NCPC is an independent board established pursuant to Article XVI of the Nassau County Charter. The Nassau County Charter was adopted and enacted by the State Legislature and has the force of state law.

63. The NCPC has jurisdiction to hear and approve applications for the subdivision of land that lies within the unincorporated areas of Nassau County and, in certain instances, land that lies within the bounds of an incorporated village or city.

64. The NCPC will only exercise that jurisdiction where the application provides for

17

subdivision that is consistent with the locally applicable zoning.

65.    In Nassau County, the towns do not hold the planning power over subdivisions. Such authority is vested solely with the NCPC.

66.    Section 1610(b)(1) of the Nassau County Charter vests the planning power over areas outside of incorporated villages and cities (*i.e.* under the municipal jurisdiction of a town) exclusively in the NCPC.

67.    Where, as here, an applicant seeks to subdivide property into more than four lots and to lay out new roadways within the subdivision, the application is deemed an application for a "major subdivision" pursuant to County Charter §1610 and Real Property Law §334-a(1).

68.    In this case, because the Property is mostly situated within the jurisdiction of Hempstead, and because certain parts of the Property are within 300 feet of the borders of incorporated Villages, the primary jurisdiction for the purposes of subdivision review is vested with the NCPC.

69.    In New York, any proposed discretionary zoning or planning matter must first undergo a review pursuant to SEQRA.  The NCPC is the lead agency in the ongoing SEQRA review of Plaintiffs' subdivision application.

70.    By the time Defendants and the Town adopted the new "Coastal Conservation District – Woodmere Club" zone, Plaintiffs had been engaged in the subdivision review process at the NCPC for approximately two-years and had incurred filing and professional fees and costs (engineering, legal, *etcetera*) of almost $2 million dollars in connection with the review process.

71.    Defendants and the Town are, and have always been, well aware of (a) the extensive planning, subdivision, and SEQRA process in which Plaintiffs were engaged, and (b) the significant cost to Plaintiffs in connection with the subdivision and SEQRA review process.

18

**The Hempstead Town Board and Councilmembers Blakeman and D'Esposito**

72.    The Town Board of the Town of Hempstead ("Town Board") is the body within the Town that is vested with the power and authority to, among other things, adopt and amend zoning laws and regulations for the Town.

73.    The Town Board does not have any planning or subdivision review authority.

74.    At all relevant times, former Town councilmember Bruce Blakeman represented the Town's Third Councilmanic District.  He was appointed to the Town Board in 2015 and was subsequently re-elected.  Part of Plaintiffs' Property lies within his former Town Board district. Blakeman was elected Nassau County Executive in 2021.

75.    At all relevant times, former Town councilmember Anthony P. D'Esposito, represented the Town's Fourth Councilmanic District. He was appointed to the Town Board in 2016 and was subsequently re-elected.  Part of Plaintiffs' Property lies within his former Town Board district. D'Esposito was elected to the United States House of Representatives in 2022.

76.    Former councilmembers D'Esposito and Blakeman, at all relevant times, were the most publicly vocal Town officials opposed to Plaintiffs' proposed subdivision and development and the primary driving forces behind the creation and adoption of the "Coastal Conservation District – Woodmere Club" zone.

**The Woodsburgh Board of Trustees and Mayors Israel and Harman**

77.    The Board of Trustees of the Incorporated Village of Woodsburgh ("Woodsburgh Board of Trustees") is the governing body of the Village of Woodsburgh.

78.    At the time Plaintiffs purchased the Property, and until 2022, Lee Israel ("Israel") was the Mayor of the Village of Woodsburgh.

19

79.    Former Mayor Israel is also a former president of the Old Woodmere Club[3] and was on the club's board when the club and its membership voted to sell the Property to Plaintiffs in April 2017.

80.    As a result of the sale to Plaintiffs, former Mayor Israel knew of Plaintiffs' development plans for the Property for years.

81.    As explained in detail below, in addition to adopting the new zone, former Mayor Israel took a special interest in singling out Plaintiffs for disparate treatment and unequal enforcement of Woodsburgh's various local ordinances, rules and regulations relating to conditions at the Property.

82.    Jacob Harman was elected mayor in or around 2023 and currently serves in such position.

**The Lawrence Board of Trustees and Mayor Edelman**

83.    The Board of Trustees of the Incorporated Village of Lawrence ("Lawrence Board of Trustees") is the governing body of the Village of Lawrence.

84.    Alex H. Edelman ("Edelman") is the present Mayor of the Village of Lawrence, elected in 2014.

85.    Mayor Edelman has publicly announced his opposition to Plaintiffs' development plans for the Property.

---

[3]    For ease of reference the term "Old Woodmere Club" refers to the Property's private country club and golf course operations during the period *prior to* Plaintiffs' ownership and management. The term "Woodmere Club" refers to the private country club as presently owned and operated by Plaintiffs. Plaintiffs have been forced to discontinue golf operations at the Woodmere Club with the 2020 season as a result of the unlawful and unequal enforcement of various local ordinances, rules and regulations by the Villages, as alleged below.

86.     Like his counterpart in Woodsburgh, Mayor Edelman has directed Lawrence officials to single out Plaintiffs for disparate treatment and unequal enforcement of Lawrence's various local ordinances and rules relating to conditions at the Property.

87.     As explained in detail below, Mayor Edelman, together with Mayor Israel, and Councilmembers D'Esposito and Blakeman, acting under color of law and in their official capacities, have conspired amongst themselves to deprive Plaintiffs of their rights secured under the United States Constitution, 42 U.S.C. §1983, and the New York State Constitution and other New York State Laws.

**Cameron Engineering & Associates, LLP**

88.     Cameron Engineering & Associates, LLP ("Cameron Engineering"), of Woodbury, Long Island, is the engineering firm that the Town retained to study and propose new zoning regulations to govern the potential residential redevelopment of golf course properties.

89.     In June 2018, Cameron Engineering issued a lengthy report to support the Town's initial down-zoning plan, the Proposed 2018 Golf Course Zone, which would have reduced the permitted development at the Property to 125 lots for single family homes (as opposed to the 59 allowed under the zoning now at issue).

90.     Less than two years later, in May 2020, Cameron Engineering issued a land use and environmental report which Defendants and the Town claim to rely on to support their adoption of the "Coastal Conservation District – Woodmere Club" zone.  The report points to, and claims to rely upon, a myriad of purported new concerns, which Cameron Engineering never raised in crafting the earlier rezoning scheme, to support its findings that Defendants and the Town should scale back the development potential from 284 to 59 lots and should create parkland on more than 80 acres of the Property.

21

91. Under the Proposed 2018 Golf Course Zone, development would have been permitted in areas that Cameron Engineering now deems unsuitable and dangerous for development.

92. The differing findings from the same engineering firm only serve to confirm that these reports and studies are shams directed to the justification of preordained political ends.

**The Five Towns Civic Association**

93. The 5TCA is a civic association formed by community members in 2016.

94. According to its website, 5TCA is dedicated to stopping the development of Plaintiffs' Property in order to preserve open green space for their local community.

95. The 5TCA claims that it "was born out of necessity, because the quality of life in our neighborhood is about to change for the worse through overdevelopment; loss of our defining green spaces and property values, while unquestionably increasing traffic, flooding and probably taxes."

<strong><u>FACTUAL BACKGROUND</u></strong>

I. **THE PROPERTY**

96. Plaintiffs own the Property, a 118 acre parcel of land, located at 99 Meadow Drive, Woodmere, New York, which is known as the Woodmere Club.

97. The Property consists of the following lots identified on the Nassau County Land and Tax Map: Section 41, Block F, Lots 37, 40, 48, 123, 310, 3028, 3029, 3030, 3032; Section 41, Block D, Lots 53, 55; Section 41, Block 72, Lot 1.

98. Plaintiffs acquired the Property on April 27, 2017. For decades a private golf and country club offering golf, tennis, swimming, catering and related amenities operated on the Property.

22

99.     Defendants and the Town adopted the "Coastal Conservation District – Woodmere Club" zone while Plaintiffs were actively managing all of the Woodmere Club's traditional country club operations, including golf and tennis, like the other golf course comparators listed below, none of which were targeted with adoption of new, restrictive "zoning." Plaintiffs were forced to discontinue Woodmere Club's golf operations in 2020, when the Villages' harassment and unlawful campaign of targeting Plaintiffs for unequal enforcement of various local ordinances, rules and regulations, set forth below, made continuing such operations impossible.

100.    The Property is located partially in Hempstead (approximately 55 acres), and in the adjacent contiguous villages of Woodsburgh (approximately 40.5 acres) and Lawrence (approximately 22.9 acres). The Property is also within 300 feet of the border of the Village of Cedarhurst.

101.    Because it is situated in three municipalities the Property is subject to the local zoning controls of each municipality, as well as the subdivision authority vested in the NCPC, pursuant to Section 1610(b)(1) of the County Charter.

102.    The map attached hereto as **Exhibit B**, illustrates which portions of the Property fell within each of the zoning districts in each Municipality before Defendants and the Town changed the zoning to the "Coastal Conservation District – Woodmere Club" zone.

103.    Due to a steady decline in golf membership, as well as a shift in demographics in the area, the Old Woodmere Club experienced a steep decline in membership over the past years.

104.    As a result of the declining membership, several years ago the Old Woodmere Club determined that its continued operation as a private membership golf and country club was not economically sustainable, and it resolved to sell its property i.e., the Property that underlies this action.

23

105.    Defendants and the Town were aware that the continued operation of the Woodmere Club as a golf course and country club is economically unfeasible.

106.    At the time Plaintiffs acquired the Property, the Old Woodmere Club's ownership was accruing operating losses of over $1 million dollars per year, and had already amassed nearly $12 million dollars in debt.

107.    Under their contract for the purchase of the Property, in addition to an approximate $12 million dollar purchase price, Plaintiffs agreed to pay off the Old Woodmere Club's debt and to continue to operate the Property as a golf course and country club for a period of time.  Plaintiffs agreed to this arrangement knowing that it would result in losses ranging from $1.4 million to $2 million for each year Plaintiffs operated the Property as a country club and golf course.

108.    Therefore, it was always Plaintiffs' expectation – well known to the Old Woodmere Club members and Defendants and the Town – eventually to discontinue the golf course and country club use and to subdivide the Property into a residential development in accordance with the applicable zoning and in a manner consistent with the character of the residential neighborhoods that surround the Property.

II.    **PLAINTIFFS CONDUCTED EXTENSIVE DUE DILIGENCE BEFORE SPENDING MILLIONS OF DOLLARS TO ACQUIRE THE PROPERTY AND HAD A REASONABLE, INVESTMENT-BACKED EXPECTATION THAT THEY COULD SUBDIVIDE THE PROPERTY AND DEVELOP 284 SINGLE FAMILY LOTS, CONSISTENT WITH BOTH THE APPLICABLE ZONING AND THE RESIDENCES IN THE SURROUNDING AREA**

109.    Before purchasing the Property, at significant expense, Plaintiffs conducted extensive due diligence regarding their potential acquisition to understand the Property's subdivision and development potential.

110.    Among other things, Plaintiffs engaged land use counsel, and commissioned an engineering and planning firm to present an inventory and analysis of the zoning, land use and

24

community character of the Property and its surrounding area. In addition, as part of their investigation before purchasing the property, the Plaintiffs looked into the market in order to confirm what they already believed to be true – that there was a tremendous demand for housing and virtually no supply.

111.    The outcome of this analysis confirmed that, prior to the rezoning at issue in this action, a 284 single-family subdivision plan, identified in the chart below, had the right to be created in complete conformity with the existing zoning regulations, without the need to obtain any zoning variances, and could be designed in a manner consistent with the community character of the surrounding area. This yield analysis was the seminal component of Plaintiffs' investment decision to purchase the Old Woodmere Club.

**Table 1     Minimum Lot Size Requirements by Zoning District**

| Municipality | Zoning District | Minimum Required Lot Area (Square Feet) | Number of Proposed Lots |
|---|---|---|---|
| Town of Hempstead | B Residence | 6,000 | 248 |
| Village of Lawrence | Residence AA | 40,000 | 12 |
| Village of Woodsburgh | Residence 1A | 43,560 | 23 |
| Village of Woodsburgh | Residence 2A | 87,120 | 1 |

III.    **DEFENDANTS AND THE TOWN HAVE, FOR YEARS, IMPROPERLY OBSTRUCTED PLAINTIFFS FROM UNDERTAKING ANY LAWFUL DEVELOPMENT ON THE PROPERTY, WITHOUT ANY LEGITIMATE PUBLIC PURPOSE**

A.    **Hempstead Passed A Moratorium that it Unlawfully Extended Indefinitely Solely for Purposes of Stymieing Development**

112.    The Municipalities' first attempt to stymie development on the Property – and to interpose as many delays as they could for as long as possible on Plaintiffs' ability to obtain the necessary government approvals that are a pre-requisite for Plaintiffs to commence any development of their Property – was to institute supposedly "temporary" moratoria on development.

113.    On November 15, 2016, the Hempstead Town Board adopted Resolution No. 1541-2016, and enacted Section 302(R) to Article XXXI of the Town's Building Zone Ordinance, which imposed a "Temporary Moratorium" that was supposed to last for 180 days, subject to 90-day extensions, on all residential development of golf course properties in the Town that were located within 500 feet of an incorporated village (the "Moratorium").

114.    The stated purpose for enacting the Moratorium was to "ensure that any residential redevelopment of golf course properties covered by the moratorium will be fully in accordance with existing area character and layout in the surrounding vicinities, including but not limited to the existing character and layout of properties in adjacent or nearby incorporated villages."

115.    In enacting the Moratorium, the Town purported to have concerns about the impact of the possible development of three different golf courses located in disparate parts of the Town, although there was no indication that any golf course other than the Property was slated for a planned development.

116.    The text of the Moratorium specifically cited the need to review zoning regulations governing minimum lot size and other "area requirements applicable to the construction of single family dwellings."

117.    During the pendency of the Moratorium, the Town Board claimed that Cameron Engineering would assist the Town in studying the residential redevelopment of golf courses and that the Town would propose new zoning regulations governing the residential redevelopment of selected golf course properties based upon Cameron Engineering's recommendations.

118.    The Town's stated "neutral" purpose in connection with the Moratorium resolution was a ploy.

119.    From the outset Defendants and the Town were solely targeting the Property and Plaintiffs, which was the only golf course property in the Town that was likely to be redeveloped in the foreseeable future.

120.    It also was the only golf course property examined by Cameron Engineering as part of what was claimed to be a project of looking at all similarly situated golf courses.

121.    Plaintiffs' Property, like the vast majority of residential parcels within Hempstead, was at the time subject to the zoning regulations set forth in the Town's Residence "B" District. The Residence "B" District permits single family homes on lots of no less than 6,000 square feet.

122.    The area in the Town surrounding the Property was, and still is, zoned within the Residence "B" District and is mostly developed with single-family dwellings on 6,000 square foot lots.

123.    Plaintiffs' subdivision proposal for the area of the Property within Hempstead called for the same – single family homes on 6,000 square foot lots, compliant with all zoning requirements.

124.    The Town's Moratorium received public support and praise from politicians in the Villages, including Lawrence Mayor Edelman, who on July 13, 2017 sent an open letter to the Town, advising: "we [Lawrence] reiterate our support and commitment to the Town's moratorium prohibiting development approval, and look forward to hearing _from_ you and working _with_ you." (emphasis in original).

125.    Additionally, in March of 2017, Nassau County legislator for the Seventh District, Howard J. Kopel, representing the interests of Nassau County, created an online petition advocating for an extension of the Town's Moratorium:

> As a resident of the Five Towns communities, I am opposed to the sale of the Woodmere Club land for the purpose of building a dense housing development. It

27

is my belief that the sale of the Woodmere Club land, and the subsequent dense housing development, creates numerous neighborhood concerns as to traffic impact, environmental implications, decreasing housing values in neighboring areas, loss of trees and plants and the potential for decrease in air quality, additional green fly and bug infestations as a result of birds being displaced or killed, additional flooding to the neighborhood due to increased impervious coverage area, ability of the sanitation district to take on all the new homes, sewer-system capacity, and increased dangerous conditions in the event of evacuation for emergency.

I further believe that it is in the best interest of our residents to extend the moratorium on golf course development imposed by the Town of Hempstead for as long as the law permits.[4]

126. All in all, the Town Board "administratively" extended the Moratorium, which was originally set to expire in May 2017, six separate times, on: May 9, 2017 (Resolution No. 726-2017), August 8, 2017 (Resolution No. 116-2017), November 14, 2017 (Resolution No. 1649-2917), February 6, 2018 (Resolution No. 198-2018), May 8, 2018 (Resolution 642-2018), and August 7, 2018 (Resolution No. 198-2018).

127. The repeated extensions of the Moratorium were political measures designed to project the Town's sympathies with those members of the public who wished to stop any sort of development of the Property.

128. The extensions also were enacted to continue to grind any development on the Property to a halt, and not for the stated purpose of allowing the Town time to study issues relating to the potential redevelopment of certain golf courses.

129. They also were designed, in intent and effect, to make it virtually impossible for Plaintiffs to proceed during the pendency of the moratoria with their applications at the NCPC for the required subdivision approval that was a necessary prerequisite for Plaintiffs to start to undertake development of their Property.

---

[4] https://www.5tjt.com/legislator-kopel-rallies-support-for-maintaining-woodmere-land/

130.     As set forth above, the NCPC will not consider an application for subdivision approval unless the applicant demonstrates that its proposed building lots comply with local zoning regulations. As Defendants and the Town intended, Plaintiffs therefore could not design a subdivision application without knowing the nature of the new regulations that the Town was purportedly fashioning during the pendency of the Moratorium, because the NCPC would not act on any such application, which could not show that it was zoning-compliant.

131.     However, at no time during the Moratorium's two-year suspension of Plaintiffs' property rights did the Town enact, or even propose, new zoning regulations for the Property. Thus, the Moratorium cost Plaintiffs two years of time during which they could not pursue any development plans. Yet the Town used the time to do nothing, except to delay Plaintiffs' ability to exercise their property rights until, at last, the State Supreme Court struck down the Moratorium as an abusive and illegal act.

132.     By its repeated extensions, for a period of two years, the Town halted Plaintiffs' ability to plan for the development of the Property. The Moratorium effectively suspended the zoning regulations governing the Property. It was enacted for the stated purpose of allowing the Town time to craft new zoning regulations for the Property, making it impossible for Plaintiffs to develop a zoning-compliant subdivision plan for the Property because Plaintiffs did not know the parameters that the Town would set for the size of building lots and the homes that may be built upon them.

133.     Having long been aware of Plaintiffs' development plans and aware that the Hempstead Moratorium could not be indefinitely extended, on October 29, 2018, Woodsburgh, under former Mayor Israel, passed its own copy-cat moratorium ("Village Moratorium")

29

specifically targeting the Property so that Plaintiffs' plan would still be blocked if and when Hempstead's Moratorium finally went away.

134.    The Village Moratorium's stated purpose "was to suspend temporarily the processing or approvals of any subdivision […] to provide the Village with the time and opportunity to consider potential changes to its zoning and land use regulations while preserving the status quo."

135.    Yet, notwithstanding the stated intent, as with Hempstead's Moratorium, the Village version was enacted solely to target Plaintiffs and to delay and ultimately block Plaintiffs' subdivision plan for the Property, as Plaintiffs' Property was the only property within Woodsburgh with subdivision potential.

136.    As with the Hempstead Moratorium, Woodsburgh's moratorium specifically targeted only area character, with no mention of environmental, traffic or other concerns, highlighting Woodsburgh's motive when it was instituted.

137.    As with Hempstead's Moratorium, the Village Moratorium made it impossible for Plaintiffs to proceed with their subdivision application at the NCPC because it was impossible to show that their plan complied with Woodsburgh's zoning.

138.    Ultimately Plaintiffs were forced to commence costly litigation against the Town in New York State Supreme Court, captioned *WG Woodmere LLC, SG Barick LLC and LH Barick LLC v. Town of Hempstead and Town of Hempstead Town Board*, Index. No. 606719/2018, to challenge the Town's repeated and unlawful extension of the Moratorium.

139.    Plaintiffs were also forced to commence another State Court action to challenge the constitutionality of Woodsburgh's moratorium, captioned *WG Woodmere LLC, SG Barick LLC and LH Barick LLC vs. Incorporated Village of Woodsburgh, et. al*., Index. No. 61690/2018.

30

140.    On December 26, 2018, the New York Supreme Court issued a Decision and Order finding Hempstead's repeatedly extended Moratorium unconstitutional as a matter of law:

> At some point, however, a 'moratorium' can amount to an unconstitutional taking or violation of a property owner's due process rights […]

> Over two full years have passed since the moratorium was first instituted. Although this court may question why it took nearly a year and a half for Cameron to write its report, it is undisputed that the Town had the analyses it sought and new zoning regulations to vote on in May of this year. That vote was scheduled to take place in May [2018], and then in June [2018]. Instead, the vote was indefinitely postponed, and the Board chose instead to extend the moratorium three more times.

> In its opposition to the motion, the defendants do not proffer *any* reason for these latest extension […]

> Plaintiffs have established as a matter of law that the moratorium is unconstitutional because it currently serves no proper purpose and it has now been extended beyond a reasonable time.

*See id.* at Dkt. No. 65 (emphasis in original).

141.    Shortly thereafter, the Village of Woodsburgh and its Board of Trustees settled the case that Plaintiffs commenced against the Woodsburgh moratorium, and agreed not to extend the Village Moratorium (which was set to expire imminently) or to institute any new moratoria after the Village Moratorium's expiration.

142.    Defendants and the Town thus used both moratoria unduly to delay their need to take action on Plaintiffs' application for subdivision approval and to delay Plaintiffs' ability to file an application for, and obtain, subdivision approval from the NCPC that was a necessary prerequisite to their ability to develop the Property.

143.    Defendants and the Town must compensate Plaintiffs for the delays associated with the moratoria, under *First English Evangelical Lutheran Church v. Los Angeles County*, 482 U.S. 304 (1987), and reimburse Plaintiffs for their legal fees and costs incurred in connection with the actions on the moratoria, pursuant to 42 U.S.C. §1988.

31

144.    In addition, as a result of the Defendants' and the Town's imposition of undue delays upon Plaintiffs' ability to obtain subdivision approval, Plaintiffs acquired a vested right in the zoning that was in place before the Defendants and the Town adopted the "Coastal Conservation District – Woodmere Club" zone.

**B.    After Defendants' and the Town's Moratorium Gambit Failed, the Town Attempted to Adopt New Zoning for the Property Through a Proposed "Down-Zoning" Plan that Would Have Decreased Permitted Density on the Property and Reduced the Number of Plaintiffs' Lots By 60%; the Town Ultimately Abandoned That Plan In the Face of Public Demands for Zero Development on the Property**

145.    Hempstead followed its moratorium by introducing a new proposed zone in April 2018, the "Proposed 2018 Golf Course Zone," which they titled "GC Golf Course Coastal Residence District (GC)".

146.    The Proposed 2018 Golf Course Zone was a classic attempt at "down zoning" to reduce density.

147.    It was supported by a lengthy land use study prepared by Cameron Engineering. *See* https://hempsteadny.gov/files/pdfs/FEAF_EEA_JUNE_2018_PART_1.pdf

148.    The Proposed 2018 Golf Course Zone, by its terms, was applicable to certain golf courses in the Town and would have required a minimum lot size for residential development of 15,000 square feet (as opposed to the  lot area requirement of 6,000 square feet of the long-existing Residence "B" zoning) and all lots in the surrounding parts of the Town.

149.    This would have almost tripled the required minimum lot size, and cut the number of development lots by a commensurate amount.  It also would have created a brand new residential zone with lot sizes larger than those in any other residential zone in the Town.

150.    As discussed in detail below, the lengthy Cameron Engineering study which the Town claimed to rely on for its Proposed 2018 Golf Course Zone purportedly reviewed significant

32

adverse environmental impacts on the Property (including but not limited to, tidal wetland degradation, and storm-water runoff from an increase in impervious cover) and community impact on taxes, traffic increase, school congestion and police and fire capabilities.

151.    Nonetheless, the Proposed 2018 Golf Course Zone would have allowed development in areas of the Property that Cameron Engineering now claims in its 2020 study will supposedly result in environmental disaster.

152.    Although the Proposed 2018 Golf Course Zone mentions two other privately-owned golf courses (Inwood Country Club and the Golf Club at Middle Bay Golf Course) which, in addition to Plaintiffs' Property, are located directly on the  water and within the New York State Coastal Boundary Area, in reality, the proposed ordinance was intended solely to target Plaintiffs' Property.

153.    Indeed, Defendants and the Town never adopted any new zoning to apply to any golf course other than Plaintiffs' Property.

154.    Nor was any golf course, other than Plaintiffs', ever actually studied as part of the Cameron Engineering assignment.

155.    For Plaintiffs, the 2018 Proposed Golf Course Zone would have had the effect of reducing the number of housing lots by approximately 60%, from 284 to 125.

156.    Plaintiffs' principals attempted to dialogue with the Town and requested that, in lieu of adopting the 2018 Proposed Golf Course Zone the Town Board should engage in cooperative discussions. These requests were ignored.

157.    Instead, the Town Board indicated that it was necessary to hold a public hearing and vote on the Proposed 2018 Golf Course Zone on May 8, 2018, because the Moratorium was set to expire.

158.    Although the Proposed 2018 Golf Course Zone would have dramatically reduced the lots in any new subdivision on the Property, because it allowed for development of just a fraction of the amount permitted by the then-applicable zoning, it quickly triggered opposition from the 5TCA and residents.

159.    As a result of the public outcry, and with the Town Board scheduled to formally introduce the Proposed 2018 Golf Course Zone the next day, some members of the Town Board, including Councilmembers Blakeman and D'Esposito, held a public information meeting on May 7, 2018, with Cameron Engineering also in attendance to explain the proposal to the local community and answer questions.

160.    The May 7, 2018 meeting was not an "official" public meeting of the Town Board, and there is thus no official transcript of the proceedings.

161.    In sum and substance, at this "unofficial" meeting, Councilmember Blakeman repeatedly said that the Town Board needed to take immediate action to prevent development of Plaintiffs' Property, whether by adopting the Proposed 2018 Golf Course Zone or by some other means, because the Town could not just continue to extend the Moratorium indefinitely.

162.    According to Councilmember Blakeman:

"We have to do something that is thoughtful. In my opinion, what we have done is very aggressive, but I think it is completely legal and justifiable, but the fact is, we cannot tell the builder they can do nothing- because they will run into court and get the 300 building lots. If we don't do something, they are going to get exactly what you do not want them to get."

163.    Councilmember Blakeman thus admitted that the entire purpose behind the Town's actions was to restrict development as much as possible regardless of Plaintiffs' rights, and that all of the other justifications which the Town pointed in support of its actions were solely after-the-fact attempts to cover what the Town was actually trying to do so it could avoid liability.

34

164.    Councilmember Blakeman also noted at this "unofficial" meeting that further extensions of the Moratorium could be found unreasonable by a court because the Town Board had already (at that time) extended the Moratorium four (4) times since its enactment.

165.    The following additional statements, among others, were made by the Town's representatives at the meeting:

    a.    The Town Board had charged Cameron Engineering to be "aggressive" and propose the "most restrictive" development of golf course properties possible;

    b.    The Town Board recognized that the Moratorium was prejudicial to Plaintiffs' constitutional property rights and, therefore, the Town Board was required to move ahead on the new proposed zoning and had sped up the process in the days shortly preceding the vote of the Proposed Golf Course Zone ; and

    c.    Cameron Engineering had purposefully kept its "study" in draft so that it could incorporate "community response" to the 2018 Proposed Golf Course Zone ordinance.

166.    By the conclusion of the meeting, it was clear that the approximately 350 residents in attendance not only opposed the Proposed 2018 Golf Course Zone, but actually opposed any and all development on the Property.

167.    To appease the assembled throng, Councilmember Blakeman said that the Town Board would postpone the public hearing scheduled for the next day, not vote on the 2018 Proposed Golf Course Zone ordinance, and extend the Moratorium yet again.

168.    Thus, on May 8, 2018 the Town board once again extended the Moratorium for another period of ninety (90) days), and announced that it would adjourn the formal introduction of the 2018 Proposed Golf Course Zone ordinance until June 19, 2018.

169.    At its public meeting on June 19, 2018, the Town Board formally introduced the Proposed 2018 Golf Course Zone, but following a series of negative public comments, the Town Board indefinitely postponed any future public hearings on the new zone. *See,* https://hempsteadny.gov/files/tbdocuments/20180619-verbatim.pdf?v1

170.    Also at the June 19, 2018 meeting, Councilmember Blakeman remarked that the Town needed to take action to prevent development of Plaintiffs' Property specifically because it could not legally keep extending the Moratorium:

> Councilmember Blakeman: [O]ne thing that is known is that it could be catastrophic to the community if two hundred and seventy-seven homes went up there […] There are a lot of issues and what we need to do is we need to draw this to a conclusion at some point because we can't go ad infinitum. The developer has already sued us saying that our moratorium is illegal and that our moratorium has gone on too long. So, we have to bring this to a conclusion sooner rather than later.

*See* https://hempsteadny.gov/files/tbdocuments/20180619-verbatim.pdf?v1 at 16:21-17:11.

171.    The Town ultimately abandoned the Proposed 2018 Golf Course Zone in the face of public opposition.

**C.  After their Efforts to Block Plaintiffs Through Moratoria and Down-Zoning Failed, Defendants and the Town Explored Taking the Entire Property for Parkland Via Eminent Domain, But that Plan Failed When Residents Made Clear that They are Not Willing to Pay Higher Taxes to Pay for the Property**

172.    After abandoning their 2018 "down zoning" plan, local officials succumbed to public pressures and began to consider the possibility of taking the entire Property by eminent domain for either: (i) a possible park district, which would be open only to residents within half-a-mile from the Property, but exclude other residents elsewhere in the Town or on Long Island, or (ii) a municipal park, open to the public at large.

173.    At a July 3, 2018 public meeting, the Town confirmed it would hire planning consultants Fredrick P. Clark Associates (the "Clark Firm"), to analyze the valuation and economic

viability of the creation of a park district or municipal park. *See,* https://hempsteadny.gov/files/tbdocuments/20180703-verbatim.pdf?v1.

174. According to a July 2, 2018 proposal from the Clark Firm to the Town, its scope of services included examining three alternatives for the Property: (i) use of the Property as a Town-owned park, containing an 18 hole golf course; (ii) use of the Property as a Town-owned park, containing a nine-hole golf course, with the remaining land to be redeveloped with active recreational facilities; and (iii) use of the entire Property as a Town-owned park, containing active recreational facilities, as well as the preservation of certain amount of passive open space with walking trails.

175. According to the proposal, the Clark Firm was to provide the results of its analysis to the Town in the form of a written report.

176. Even though there are several other private golf courses within the Town, the Woodmere Club was the only property the Town directed the Clark Firm to study for the potential park district.

177. On May 17, 2019, Councilmembers D'Esposito and Blakeman announced that an "Official Woodmere Golf Course Survey" had been mailed to all households within approximately a half mile of the Property.

178. The Survey described any proposed development on the Property as "unacceptable to the Town" for reasons of "congestion, overcrowding, traffic impact, environmental concerns, and of course preservation of surrounding residences."

179. The survey asked residents for their opinion about creating a new special park district encompassing the entire Property solely for residents within the special district, which would come with increased average annual property taxes to those residents of between $2,000 to

$4,000 annually for at least the next 20 years to support the acquisition and maintenance of the proposed park.

180.    On June 21, 2019, the *LI Herald* posted a letter to the editor written by then-Town Supervisor Gillen, who said that the "Official Woodmere Golf Course Survey" that Councilmembers Blakeman and D'Esposito touted was "created and sent without my input or support."

181.    Supervisor Gillen's letter further indicated that the entire process was, and always had been, a sham designed to block all development at the Property, and that the Survey was circulated simply to provide cover for a process that already had a predetermined outcome.

182.    According to Supervisor Gillen, "[t]he members of the Town of Hempstead council who represent the area decided to break away from working with the supervisor's office, and as a result have caused more harm than good.  While the council members have claimed the survey was simply to solicit residents' feedback […] the lack of information on how they came up with the limited options offered was panic inducing…"

183.    In addition, making clear that the Town had commissioned the so-called "study" with the outcome already determined, Supervisor Gillen wrote, "[t]he special park district study is still not complete.  Neither is the proposed zoning study.  These documents need to be completed, contemplated and shared with residents before the community can make an informed decision… Taxpayers deserve more than a premature 'survey'."

184.    In a June 2019 Facebook post, Councilman Blakeman virtually admitted that his survey was a sham, and conceded that taking the Property by eminent domain was not feasible: "If the County could afford to buy it, which they can't, then you would rather have a Regional Park

38

open 7 days a week?... The Town and County simply don't have the resources to buy it and the neighbors aren't going to pay for a Park District."

185.    Ultimately, on May 5, 2020, in response to Plaintiffs' formal demands that the Town produce relevant documents under New York State's Freedom of Information Law – (demands that the Town had stonewalled until a New York State Supreme Court justice ordered the Town to respond in another action Plaintiffs were forced to commence against the Town) the Town's counsel admitted that no land review reports prepared by the Clark Firm existed.

186.    After receiving the survey responses, the Town determined that the cost of creating a park district was prohibitive because the residents refused to pay the taxes necessary to fund the compensation to which Plaintiffs would have been entitled by law, had the Town taken the Property under its eminent domain power.

187.    Further, the overall cost of acquisition, development, and debt service necessary to create a municipal park was a significant expense for the Municipalities that they could not afford, because a park would not produce any tax revenues.

188.    Focused again on avoiding opposition, Defendants and the Town ultimately dropped the idea of using eminent domain and decided to simply take the Property without paying for it; to call what was obviously a taking, in both intent and effect, "zoning," and adopted the "Coastal Conservation District – Woodmere Club" zone.

IV.    **WHILE DEFENDANTS AND THE TOWN WERE TRYING EVERYTHING POSSIBLE TO STOP PLAINTIFFS FROM DEVELOPING ANYTHING AT ALL, PLAINTIFFS FILED THEIR SUBDIVISION APPLICATION WITH THE NCPC TO OBTAIN SUBDIVISION APPROVAL UNDER THE AS-OF-RIGHT ZONING AND THE NCPC COMMENCED SEQRA REVIEW OF PLAINTIFFS' APPLICATION**

189.    While Defendants and the Town were taking the steps outlined above to block Plaintiffs' development plans for the Property, and even while Plaintiffs were offering to meet

with public officials in an effort to find a mutually acceptable alternative that would obviate the perceived need for any rezoning as well as for litigation, Plaintiffs filed their application for subdivision approval pursuant to the mandates of New York State law.

190.     On December 7, 2018, Plaintiffs filed an application with the NCPC for subdivision approval to create a new "filed map" to be known as "Willow View Estates" (the "284-Lot Subdivision Plan").

191.     In their application, Plaintiffs sought to subdivide the Property into 284 single family residential lots that fully complied with the then-effective (and long existing) zoning regulations in each jurisdiction.  A true and correct copy of the proposed 284-Lot Subdivision Plan map is attached hereto as **Exhibit C**.

192.     To comply with the subdivision review regulations of the NCPC, Plaintiffs' 284-Lot Subdivision Plan contained detailed and substantial amounts of environmental and engineering data, including a fully-engineered subdivision plan for the entire Property.

193.     Plaintiffs paid an initial filing fee of $342,000 to the NCPC to commence the process.

194.     Importantly, Plaintiffs could not begin construction on the Property unless and until their 284-Lot Subdivision Plan was approved by the NCPC.

195.     Upon receipt and initial review of Plaintiffs' proposed 284-Lot Subdivision Plan, the NCPC commenced the mandated review of the matter under SEQRA, an exhaustive review process that must be completed before the NCPC can make final determination on the subdivision application.

40

196.    In early 2019, the NCPC officially declared itself "Lead Agency" for the purposes of the SEQRA review process and issued a "Positive Declaration," a determination that triggers the most detailed and extensive form of environmental review provided by law.

197.    The Defendants and the Town were "involved agencies" under SEQRA and had the right to be "Lead Agencies," upon their request.

198.    Neither of Defendants nor the Town objected to the Lead Agency status for NCPC or asked to be named a Lead Agency themselves.

199.    To the contrary, the Defendants and the Town declined to participate substantively in the NCPC subdivision application review process, even though the SEQRA process anticipates that involved agencies would participate.

200.    To study and address any potential adverse environmental impacts that could result from Plaintiffs' proposed 284-Lot Subdivision Plan, the NCPC then ordered Plaintiffs to prepare and submit a full DEIS.

201.    The DEIS is the essential tool for the planning process, as it analyzes a vast array of possible environmental impacts that might occur based upon a proposed development and proposes ways in which to mitigate against the most significant of those impacts.

202.    As the first step in the SEQRA process, the NCPC engaged in "scoping" review, a process that determines the "table of contents" for the DEIS, which then lists the issues that the DEIS must study.

203.    The scoping process involved multiple iterations of the "table of contents" for the DEIS and, as involved agencies, Defendants and the Town were made aware of the proposed scope and were given the right to comment thereon.

41

204.     Neither of the Defendants nor the Town submitted substantive comments on the proposed scope or took part in the scoping process.

205.     Following a public hearing on June 26, 2019, the NCPC adopted a final scope to Plaintiffs' DEIS.

206.     Thereafter, Plaintiffs and their engineers spent the next several months preparing the DEIS in a manner consistent with the final scope set by the NCPC.

207.     Ultimately, on May 14, 2020, over a year-and-a-half after Plaintiffs filed their application for approval of the proposed 284-Lot Subdivision Plan, and after having expended approximately $2 million dollars in the process, the NCPC declared Plaintiffs' DEIS "complete" and accepted it for review. At the same time, the NCPC opened the required period for public comment on the DEIS.

208.     The topics covered in Plaintiffs' DEIS included:

- Physical Alteration of Land (including, subsurface and environmental conditions, soils, geotechnical investigation, topography);
- Water Resources and Floodplains (including among other topics: surface waters, floodplains, Superstorm Sandy, Nassau County Back Bays Coastal Storm Risk Management Study, Stormwater, Five Towns NY Rising Community Reconstruction Plan, Groundwater Resources, Coastal Resources);
- Ecology and Wetlands;
- Aesthetic Resources;
- Historic and Archaeological Resources;
- Recreational Opportunities and Open Space;
- Transportation;
- Energy;
- Zoning, Land Use and Community Character;
- Noise, Odors and Lighting;
- Climate Change (including sea-level rise, greenhouse gas emissions);
- Construction Impacts;
- Alternatives (Required No action Alternative, Cluster Plan, Reduced Density Plan with 9-Hole Golf Course); and
- Growth-Inducing Impacts.

209.    Plaintiffs' DEIS also included, among other things, a Traffic Impact Study, environmental site assessment, and a topographic survey, all conducted in accordance with New York law.

210.    Instead of participating in the NCPC review of Plaintiffs' 284-Lot Subdivision Plan through the SEQRA process (which addresses all the environmental concerns the new zoning at issue purports to address), the Municipalities instead elected to adopt the new "Coastal Conservation District – Woodmere Club" zone in an effort to circumvent SEQRA and the subdivision process, and to impose their own new plan for a development scheme upon the Property.

211.    All of Defendants' and the Town's supposed environmental concerns noted in the "Coastal Conservation District – Woodmere Club" zone and the corresponding Cameron Engineering study have been addressed in Plaintiffs' DEIS through the SEQRA review.

212.    Defendants and the Town unduly delayed their participation in the SEQRA process and thus, for this reason as well, Plaintiffs had a vested right in the zoning applicable to the Property immediately prior to Defendants' and the Town's adoption of the "Coastal Conservation District – Woodmere Club" zone.

213.    To date, Plaintiffs have paid approximately $700,000 dollars in fees to Nassau County in connection with the NCPC's subdivision review process.

214.    To date, Plaintiffs have paid approximately $1,500,000 dollars to their consultants, architects, engineers, legal counsel and other professionals in connection with their proposed 284-Lot Subdivision Plan.

V.    **HAVING FAILED IN ALL THEIR PREVIOUS EFFORTS, AND WITH THE NCPC MOVING THE SEQRA PROCESS FORWARD, DEFENDANTS AND THE TOWN HURRIEDLY VOTED TO ENACT THE NEW "COASTAL CONSERVATION DISTRICT – WOODMERE CLUB" ZONE, A NEW ZONING DISTRICT THAT APPLIES ONLY TO PLAINTIFFS' PROPERTY**

   A. **Defendants and the Town Entered Into An Unprecedented Inter-Municipal Agreement to Permit Hempstead To Shield the Villages from the Full Consequences of Their Illegal Conduct, which They Could Never Afford to Bear On Their Own**

215.    With the expiration of the moratoria, the abandonment of the 2018 Proposed Golf Course Zone, the collapse of the eminent domain parkland plan, and the NCPC moving the SEQRA process forward on the 284-Lot Subdivision Plan, Defendants and the Town formally joined forces and colluded with each other to block Plaintiffs' development plan with an illegal zoning scheme.

216.    In the months of November and December 2019 and January 2020 Defendants and the Town entered into an Intermunicipal Cooperation Agreement ("IMA") to coordinate their attack on Plaintiffs' property rights.

217.    Under the IMA, Defendants and the Town agreed to work together to draft, and adopt, "mirror image" zoning ordinances that would impose a single zoning scheme on the Property. *See,* https://hempsteadny.gov/files/pdfs/IMA.pdf

218.    Defendants and the Town justified the adoption of the IMA due to the Property's location within three different jurisdictions and the supposed need to jointly address "environmental concerns" presented by the development of the Property for residential and commercial use.

219.    In addition, knowing that the enactment of the proposed "Coastal Conservation District – Woodmere Club" zone would affect a taking without providing any compensation to Plaintiffs, and that their actions were unlawful for that reason as well as for others, and fully

expecting Plaintiffs to sue, each Municipality adopted by resolution a fee sharing agreement (the "Fee Sharing Agreement").

220.    Under the Fee Sharing Agreement, even though each Municipality has differing abilities to pay legal fees and any judgment that may ultimately be rendered against it, Defendants and the Town nevertheless agreed that "Hempstead would pay 70% for such incurred legal services and costs" in association with any action the Plaintiffs may commence to challenge the enactment of the "Coastal Conservation District – Woodmere Club" zone, "with the Villages responsible for the remainder" of such costs and fees.

221.    In addition, the Municipalities agreed to retain jointly the services of a single law firm, to be selected by Hempstead.

222.    Under the Fee Sharing Agreement, even though Hempstead's portion of the Property encompasses only about 50% of the total Property, Hempstead nonetheless will pay 70% of legal costs and take the lead in any litigation.

223.    The Fee Sharing Agreement also improperly and illegally induced the Villages to support their respective versions of the "Coastal Conservation District – Woodmere Club" zone by requiring that the Villages remain parties to the IMA and prohibiting them from amending or repealing aspects of the new zone under their jurisdictions.

224.    If the Villages withdraw from the IMA or enact "unapproved" changes to the zoning regulations governing the Property, under the Fee Sharing Agreement, they would be obligated to pay 100% of their own legal fees and retain their own lawyers.

**B. After Delaying Acting on Plaintiffs' Application at the NCPC for Two Years, The Municipalities Introduce and Adopt the "Coastal Conservation District – Woodmere Club" Zone**

225. Mere days after the NCPC declared Plaintiffs' DEIS complete and ready for review, each Municipality formally introduced its version of the "Coastal Conservation District – Woodmere Club" zone on May 18, 2020, May 19, 2020, and May 21, 2020, respectively.

226. On June 23, 2020, Defendants and the Town held an unprecedented joint public hearing regarding the "Coastal Conservation District – Woodmere Club" zone.

227. At the hearing, Plaintiffs' land use counsel objected to the "Coastal Conservation District – Woodmere Club" zone as an illegal enactment that should be voted down. Counsel once more urged dialogue between all parties instead of strife and litigation. A copy of the statement is attached hereto as **Exhibit D**.

228. The Municipalities ignored the objection and concluded the public hearing.

229. On June 29, 2020 and July 1, 2020, Defendants and the Town formally adopted the "Coastal Conservation District – Woodmere Club" zone. A copy of Hempstead's resolution adopting the new zone is attached as **Exhibit E**; a copy of Woodsburgh's resolution adopting the new zone is attached as **Exhibit F**; and a copy of Lawrence's resolution adopting the new zone is attached hereto as **Exhibit G**.

230. The Defendants' and the Town's stated purpose for enacting the "Coastal Conservation District – Woodmere Club" zone is: "to regulate development in the environmentally sensitive coastal areas that span the municipal boundaries of the Town and the contiguous Villages of Lawrence and Woodsburgh, including the area occupied by the former Woodmere Club – allowing for the enhanced preservation and protection of the Town's and neighboring Villages'

46

environmental, coastal, open space and cultural resources and the preservation of the residential neighborhoods."

231.    In addition, the stated purpose recites as its principal rationale the need to manage "current and future physical climate risk changes due to sea level rise, storm surge and flooding."

232.    There is no comprehensive environmental, or other, study that supports the adoption of the "Coastal Conservation District – Woodmere Club" zone.

233.    The "study" that accompanied the "Coastal Conservation District – Woodmere Club" zone was prepared by Cameron Engineering in the form of an "Expanded Environmental Assessment" ("EEA").  *See* https://hempsteadny.gov/files/pdfs/Expanded-EA.pdf

234.    The EEA is not the product of years of analysis of the environmental problems it references. Rather, it was prepared entirely as a fig leaf to cover the naked land grab that is the "Coastal Conservation District – Woodmere Club" zone.

**C. The "Coastal Conservation District – Woodmere Club" Zone Dramatically Curtails Development and Takes Plaintiffs' Valuable Property Rights**

235.    The newly created "Coastal Conservation District – Woodmere Club" zone replaces the zoning districts listed in Table 1, Paragraph 100 above, with a new zoning scheme that sets forth three new "subdistricts": (i) the "Open Space/Recreation Sub-District;" (ii) the "Single-Family Residential Subdistrict;" and (iii) the "Clubhouse/Hospitality Subdistrict." A true and correct copy of the "Coastal Conservation District – Woodmere Club" subdivision map yield is attached hereto as **Exhibit H**.

236.    Under the prior zoning, Plaintiffs had the right to develop 12 building lots for single family homes within Lawrence.

47

237.    Under the new "Coastal Conservation District – Woodmere Club" zone's restrictions Plaintiffs are not permitted to place any lots for single family homes within Lawrence's jurisdiction, a reduction of 100%.

238.    Under the prior zoning, Plaintiffs had the right to develop 248 building lots for single family homes within the Town of Hempstead.

239.    Under the new "Coastal Conservation District – Woodmere Club" zone's restrictions, Plaintiffs are only permitted to develop 41 building lots for single family homes within Hempstead's jurisdiction, a reduction of 84%.

240.    Under the prior zoning, Plaintiffs had the right to develop 24 building lots for single family homes within Woodsburgh.

241.    Under the new "Coastal Conservation District – Woodmere Club" zone's restrictions, Plaintiffs are only permitted to develop 18 building lots for single family homes within Woodsburgh's jurisdiction, a reduction of 25%.

242.    Under the new "Coastal Conservation District – Woodmere Club" zone's restrictions, Plaintiffs are thus only permitted to develop a maximum of 59 building lots for single family homes on the Property, a reduction of approximately 80% overall.  As stated above, Defendants and the Town have further designated 95% of that reduction to be set aside as "parkland" on which all building and other economically productive uses are prohibited.

243.    Defendants and the Town have thus deprived Plaintiffs of 100% of the value of their Property in Lawrence, and at least 84% of the value in Hempstead and 25% of the value in Woodsburgh through the rezoning.  These percentages are based merely on the raw numbers.  In reality, as the evidence will show, the radical reductions on usage in each of the Municipalities will have a progressively larger impact on the value of the Property as a whole.

48

i.    The "Coastal Conservation District – Woodmere Club" Zone Enacts A Conservation Easement on More Than 70% of the Property Set Aside Exclusively for "Parkland" Under its Terms.

244.    For the stated purpose of purportedly addressing severe storms and coastal storm surges, the "Coastal Conservation District – Woodmere Club" zone imposes an "Open Space/Recreation Sub-District" (the "Open Space Subdistrict") that applies to approximately 83.3 acres of the total Property, of which 35.7 acres lie within the 55-acre portion of the Property subject to Hempstead's jurisdiction. *See, e.g.* Exhibit E, at §76.18(A);    EEA (https://hempsteadny.gov/files/pdfs/Expanded-EA.pdf) at pg. 19.

245.    This subdistrict limits "permitted uses" to "open space parkland [which has no economic value at all], passive parkland  [which has no economic value at all], or a nine-hole golf course [the only use with seemingly any value but no real value]." *See e.g.* Exhibit E, at § 76.26(A); § 76.18(A).

246.    However, the history of the Old Woodmere Club shows that use of the Property even as an 18-hole golf course is not economically viable.

247.    The reason The Old Woodmere Club sold its property to Plaintiffs in the first place is because it determined that its continued operation as a golf club in any configuration was not economically sustainable.  At the time The Old Woodmere Club sold its property to Plaintiffs, its ownership was accruing operating losses of over $1 million dollars per year, and had already amassed nearly $12 million dollars in debt due to declining memberships.

248.    Indeed, the Old Woodmere Club is just one of many private golf courses in the area that had been forced to sell due to a decline in memberships in recent years. For example, the Seawane Club, another golf course nearby, was put up for sale and sold while the Defendants and the Town were engaged in the course of conduct alleged herein, for the very same reason; *i.e.,*

49

non-economic viability.

249.    The Municipalities even admit in the "Coastal Conservation District – Woodmere Club" zone ordinance itself that golf courses, including The Old Woodmere Club, are closing as a result of declining golf participation and memberships at golf clubs, and therefore are not economically feasible. *See e.g.* Exhibit E, at § 76.18(A).  This is a nation-wide phenomenon.

250.    The inclusion of the golf course use within the Open Space Subdistrict is thus illusory; it is an attempt to disguise the fact that the Open Space Subdistrict creates the equivalent of a park out of privately owned land.

251.    Thus, the zoning scheme set forth in the "Coastal Conservation District – Woodmere Club" zone would make it physically impossible to design and run a golf course of any kind.  The "Coastal Conservation District – Woodmere Club" zone places the area for lots for single family homes (an area in which no golf course is permitted) in the middle of the Property and makes no provision for parking or any form of attendant commercial use within the Open Space Subdistrict.

252.    Consequently, by designating more than 80 acres of Plaintiffs' Property as passive "parkland," Defendants and the Town imposed a permanent conservation easement upon Plaintiffs' Property without providing any compensation for it, all for the benefit of neighboring properties and all at Plaintiffs' sole expense.

253.    Although Plaintiffs are precluded from making any productive economic use of any portion of the Property located within the Open Space District, the "Coastal Conservation District – Woodmere Club" zone nonetheless mandates that Plaintiffs maintain such land and even install new, costly drainage infrastructure to service it.

254.    For example, this sub-district purports to require Plaintiffs to install, at their own expense, active flood management equipment on the Property.  That equipment is of no use to Plaintiffs but is solely designed to provide flood control for neighboring properties.

255.    In addition, Plaintiffs are still subject to continuing obligations under various local ordinances to maintain the Property at a cost in excess of $3 million dollars annually, or risk fines for failing to do so, and also must maintain property insurance.

256.    Plaintiffs will also still be obligated to pay taxes to the Municipalities for all the areas on the Property designated as "parkland."  As the New York Court of Appeals summed it up long ago, "The only substantial difference, in such case, between restriction and actual taking, is that the restriction leaves the owner subject to the burden of payment of taxation, while outright confiscation would relieve him of that burden."  *Arverne Bay Const. Co. v. Thatcher*, 278 N.Y. 222, 232, 15 N.E.2d 587, 592 (1938).

257.    Thus, not only have Plaintiffs been compelled to give up any economic benefit from over 80 acres of their property, they are saddled with all of the burdens, but none of the benefits of ownership, amounting to carrying costs of more than $3 million dollars annually.

258.    In sum and substance the "Open Space/Recreation Sub-District" simply piles up economic losses to Plaintiffs. Plaintiffs are forced to keep paying property taxes to the Municipalities on the open space, are forced to incur costs for maintenance and upkeep for the Property, and are forced to expend exorbitant costs on new equipment that the new zoning compels them to install on and under the open space, just to be able to develop [theoretically, but not actually] the few lots remaining to them under the new zoning.

259.    Further, with respect to the maximum of 59 lots Plaintiffs can ostensibly develop under the new zoning, Defendants' and the Town's new conditions and restrictions in the new

"Coastal Conservation – Woodmere Club" zone have almost tripled the hard construction costs allotted to each lot (as compared to the prior zoning), and thus eliminated the economic productivity of such lots.

260.    By saddling the few remaining lots available for development with almost triple the costs to develop, Defendants and the Town have intentionally made it economically unfeasible for Plaintiffs to develop the Property and sabotaged the reasonable investment backed expectations that Plaintiffs had when they purchased the Property.

261.    Indeed, no reasonable person would have purchased the Property for the price Plaintiffs paid (including absorbing the significant indebtedness of the Old Woodmere Club and continuing to operate it at a loss for years) if the number of lots developable on the Property was limited to a maximum of 59.  That is not an economically productive use of an investment of that size.

262.    This is especially so given the nature of the onerous and burdensome restrictions with which the Defendants and the Town have saddled the Property in the "Coastal Conservation District – Woodmere Club" zone, which makes the Property not available for any economically productive use.

> ii.    *The "Coastal Conservation District – Woodmere Club" Zone Enacts A Residential Subdistrict that Restricts Plaintiffs' Ability to Develop 80% of the Acreage that Plaintiffs Formerly had the Right to Develop, and Is Inconsistent with its Stated Purpose of Preventing Flooding Because it Allows for Development in Flood Zones while Restricting Development Outside the Flood Zone.*

263.    The second subdistrict, the "Single-Family Residential Subdistrict" (the "Single Family District") covers approximately 29.4 acres of the Property, 19.3 of which are located in the Town and the remaining 10.1 acres of which are located within the Villages.

264.    The Single Family District regulates approximately 25% of the Property.

52

265.    Only a tiny sliver of the Single Family District is within Lawrence, and it therefore does not allow for the development of any single family lots in that village at all.

266.    In Hempstead, the Single Family District applies to 35.1 % of the overall Property.

267.    In Woodsburgh, the Single Family District applies to 20.5 % of the overall Property.

268.    Meanwhile, Defendants' and the Town's claimed motivation for enacting the "Coastal Conservation District – Woodmere Club" – the purported need to limit development within sensitive flood zones – is completely at odds with the new zone itself.

269.    Indeed, the Single Family District allows residential development almost exclusively in areas of the Property that lie within a flood zone.  Conversely, the Open Space District prohibits development in parts of the Property that are not within a flood zone.

270.    This illogical regulatory scheme demonstrates the sham nature of the justification for the "Coastal Conservation District – Woodmere Club" zone.

271.    The design of the subdistricts has nothing to do with flooding; the design is simply intended to mandate the maintenance of a huge buffer around the outer areas of the Property.  *See* EEA (https://hempsteadny.gov/files/pdfs/Expanded-EA.pdf) at pp. 7, 9, 18, 21, 23.

272.    Although approximately 42,000 parcels (or 14,000 acres) of land within the Municipalities sit within a flood zone (which is about 18% of all parcels within the Town, 40% of all parcels within Lawrence, and 50% of all parcels within Woodsburgh) the "Coastal Conservation – District Woodmere Club" zone rezones only 12 parcels (118 acres) on account of purported flood issues, and applies only to Plaintiffs' Property.  *See* Exhibit A.  No other zoning district in any of the Municipalities places the kind of building requirements on flood prone properties that the "Coastal Conservation District – Woodmere Club" zone does.

273.    In addition, the Proposed 2018 Golf Course Zone required a **50-foot** greenbelt privacy buffer around the entire Property.  The "Coastal Conservation District – Woodmere Club" zone, however, places **80 acres of the Property itself off limits to residential development**.  That fact and that the "Coastal Conservation – District Woodmere Club" zone only allows approximately ten lots located <u>outside</u> of the flood zone demonstrates that Defendants' and the Town's intent was not actually to protect from flooding, but to create a huge area of land in which Plaintiffs cannot develop their Property in order to appease anti-development neighbors and political activists.

274.    Indeed, the less than miniscule effect on flood zone properties in the Municipalities as a result of the "Coastal Conservation District  – Woodmere Club" zone dramatically demonstrates that the Defendants' and the Town's "flood zone" claims are bogus.

275.    18% of Hempstead is located within a flood zone, but the "Coastal Conservation District – Woodmere Club" zone only affects 0.03% of that 18%;

276.    40% of Lawrence is located within a flood zone, but the "Coastal Conservation District – Woodmere Club" zone only affects 0.37% of that 40%;

277.    50% of  Woodsburgh is located within a flood zone, but the "Coastal Conservation District – Woodmere Club" zone only affects 6.35% of that 50%.

> iii.    *The "Coastal Conservation District – Woodmere Club" Zone Designates A Specific Clubhouse/Hospitality Sub-District to Ensure the Use Will Always and Forever Remain a Clubhouse*

278.    The third subdistrict lies completely within the jurisdiction of Woodsburgh and is known as the "Clubhouse/Hospitality Sub-District" (the "Clubhouse District").

279.    The Clubhouse District "is limited to approximately 5.7 acres within the Village of Woodsburgh portion of the Property" and encompasses the existing clubhouse facility for the

54

former golf course and the amenities associated with it, including its athletic courts, swimming pool and parking lot. *See e.g.* Exhibit F, at §150-110(C).

280.    The stated intent of the Clubhouse District is "to preserve and enhance the existing clubhouse of the Woodmere Club ..." which the ordinance calls a "prominent community asset" of "historic character." *See e.g. id.* at §150-102; §150-110(C).

281.    Thus, Woodsburgh has admitted it used zoning regulations to preserve the use that already exists within the Clubhouse District, and to preserve the "historic" structure located in that district.

282.    In an unprecedented use of a zoning regulation, the minimum lot size required in the Clubhouse District is the entirety of the land governed by the Clubhouse District – 5.7 acres. Thus, the Clubhouse District allows for just one building lot.

283.    The permitted building area, lot coverage and height requirements in the Clubhouse District are all precisely pegged to the existing Clubhouse Building's footprint, square footage, lot coverage and height.  *See id*. at §§150-128-130.  Meaning, although Plaintiffs could theoretically demolish the Clubhouse it would make no sense for them to do so as they are limited to replacing it almost precisely with a facsimile of it.

284.    The Clubhouse District is not in reality a zoning district; rather, it attempts to use zoning to effectively landmark both a building and the uses of land, such that the subject 5.7 acres remains always and forever limited to a clubhouse with a specific design and appearance including tennis courts and a pool.

285.    Once again, the "Coastal Conservation District – Woodmere Club" zone puts the burden of the operation and maintenance of the old clubhouse and its facilities solely upon

55

Plaintiffs, who can have no choice but to run the facility in some way, since doing so is the only use permitted to them in this sub-district.

286. Thus, at Plaintiffs' expense, Woodsburgh will forever enjoy the benefits of the clubhouse, the place in which Mayor Israel spent so much time as a member of the old club's board before the old board sold the Property to Plaintiffs.

287. The maintenance and operation of the Clubhouse and amenities cost Plaintiffs hundreds of thousands of dollars a year.

288. Yet the Clubhouse District would restrict Plaintiffs to use only the already existing Clubhouse, or to construct a new building on its exact footprint having the exact same dimensions, that Plaintiffs could use solely for hospitality; *i.e.,* catering and overnight stays, or religious or educational uses. All of these permitted uses operate at a loss.

289. There has been no analysis by the Municipalities of whether the proposed limited uses of the Clubhouse District are economically feasible, productive, or beneficial.

290. To the contrary, Plaintiffs would be forced to continue to pile up losses every year with owning the Property in this sub-district, on top of the loss of the economic value to the Property as a result of the rezoning into this sub-district.

291. Plaintiffs have thus been deprived of all economically beneficial or productive uses of the portion of the Property within the Clubhouse District.

> **D. Defendants and the Town Claimed to Rely on The Same Engineers Who Said in 2018 that Limiting Development at the Property to 125 Lots for Single Family Homes was Appropriate But Now Claim that Only 59 Housing Lots Should be Allowed There**

292. Cameron Engineering's EEA does not even attempt to square its purported conclusion in 2020 with those in its 2018 report, in which Cameron Engineering concluded, just two years earlier, that a 125-single-family-residence-development within the Property was fine.

293. The Proposed 2018 Golf Course Zone, and the 2018 Cameron Engineering Report, set forth an entirely different set of regulations from those now enacted by the "Coastal Conservation District – Woodmere Club" zone and would have permitted development in areas of the Property that the EEA now claims would result in environmental disaster.

294. In 2018 – evidently, before residents outraged at the possibility of any development nearly rioted at Councilmembers Blakeman and D'Esposito's "unofficial" public meeting about the Proposed 2018 Golf Course Zone – redevelopment in those very same areas was just fine.

295. For example, the proposed mitigation measures discussed in Cameron Engineering's 2018 report include increased lot sizes to 40,000 and 20,000 square foot lots, implementing limits on impervious surfaces and requiring storm water to be addressed on each building lot, with the stated purpose of aligning the development parameters with State regulations that apply to development adjacent to wetlands.

296. Yet the 2018 report makes no mention of precluding development in any specific area of the site other than providing for perimeter buffers.

297. By contrast, Cameron Engineering's EEA recommends that no development should take place within the 80 acre Open Space District, which largely could have been developed subject to the 2018 plan.

298. In addition, the Proposed 2018 Golf Course Zone did not include: any parkland; any land set aside for public flooding mitigation; or any designation of a specific clubhouse district.

> i. *Cameron Engineering's EEA in support of the "Coastal Conservation District – Woodmere Club" zone is flawed and consists solely of conclusory allegations with little to no technical analysis to support its conclusions, and is obviously a result-driven exercise created solely to cover-up Defendants' and the Town's unlawful conduct*

299.    Cameron Engineering's EEA attempts to tie the proposed "Coastal Conservation District – Woodmere Club" zone to a need for a drastic reduction in the residential yield of the Property to provide additional area in which to accommodate stormwater infiltration.  However the EEA contains zero inventory analysis to provide technical substantiations that would support its assertion.

300.    Unsurprisingly, the EEA makes only a passing mention of the DEIS that was prepared for Plaintiffs' proposed Subdivision, which has undergone critical technical review and acceptance by the NCPC.

301.    Indeed, the comprehensive information and analysis from Plaintiffs' DEIS, which Cameron Engineering ignored, is evidence that the Subdivision as proposed would not result in significant environmental impacts.

302.    The EEA itself expressly admits its deficiencies, as compared to the comprehensive DEIS Plaintiffs submitted as part of the Subdivision approval process under SEQRA, noting that "…any future development of the golf course would require further, site-specific ecological investigations to determine if there would be development constraints associated with these habitats and potential rare plants and/or animals. Therefore, the impact of these potential issues on the development of the subject property is unknown at this time."  Nothing is "unknown."  It is all discussed in the DEIS.

**E. The New Zone Improperly Singles Out Plaintiffs' Property -- and Plaintiffs Themselves -- For Illegal, Disparate Treatment**

   i.    *The New Zone's Draconian Restrictions Do Not Apply to Any Other Similarly Situated Property Or Property Owners in the Municipalities*

303.    Cameron Engineering's EEA identifies supposed significant environmental issues that broadly affect "coastal communities" and concedes that the existing zoning regulations,

58

regulations that govern thousands of parcels that lie within the Municipalities' coastal areas, are inadequate to address these critical problems. Yet the EEA calls for a novel regulatory regime solely applicable to the 118-acre Property and not to any other property in the Municipalities.

304. Further, the EEA maps out the flood zones only on the Property. It does not identify the surrounding properties that are also in federally designated flood zones or explain why special zoning requirements shouldn't extend to those similarly-situated parcels.

305. Indeed, aside from the "Coastal Conservation District – Woodmere Club" zone, no zoning district within the Municipalities' respective jurisdictions compels the maintenance of "passive recreation" areas on private property.

306. For example, the new zone does not apply to other large tracts of land in the 100 and/or 500 year flood zones, including any of the other similarly situated golf courses in the Municipalities, such as the Rockaway Hunting Club, Inwood Country Club, the Golf Club at Middle Bay, and the Lawrence Yacht & Country Club (the "Comparator Golf Clubs").

307. As evidenced from the image maps attached hereto as **Exhibit I**, all of the Comparator Golf Clubs, one of which, the Rockaway Hunting Club, borders Plaintiffs' Property, are located in flood zones.

308. As noted above, although all of these properties and Plaintiffs were in operation as active golf and country club facilities when the Defendants and the Town adopted the new "Coastal Conservation District – Woodmere Club" zone, none, other than Plaintiffs' was targeted for new zoning.

309. Nonetheless, the Municipalities have kept all of the Comparator Golf Clubs in residential zones just like the zones previously applicable to Plaintiffs' Property.

   ii. *The Defendants and the Town Have Improperly Singled Out and Targeted Plaintiffs Based on Ugly Stereotypes*

310.    On February 19, 2020, Woodsburgh posted on its official website a letter written to the editor of the *5 Towns Jewish Times* by the 5TCA, which Mayor Israel called "very well written." The letter referred to Plaintiffs and their principals as "greedy" interlopers from out of state, who did not care about the community, simultaneously demonstrating animus against the Plaintiffs based on classic anti-Semitic tropes and noting that Plaintiffs do not reside in New York, all of which are impermissible, illegal bases for the Defendants' and the Town's actions.

311.    For example, the letter, posted on Woodsburgh's website, stated:

- "if you live in New Jersey, you probably don't really care about the traffic problems and gridlock that the residents of the Five Towns have to put up with on a daily basis."

- "According to public record, they paid a little over 9 million dollars and assumed 15 million in debt for the entire 114 acre piece of property. They are poised to make an excellent return on their investment. As one resident so eloquently stated at the last public meeting '**I look at this map and all I see is greed**'"

(Emphasis in original).

312.    In addition, the letter confirmed the consensus that the community (and municipal officials) would compromise at nothing: "[w]e maintain that 283 homes in any configuration (apartments or homes) is still way too much […] once green space is gone, it's gone forever."

313.    In an open letter posted to Woodsburgh's website, the Village's Board of Trustees echoed the 5TCA sentiments, alleging that Plaintiffs care nothing for the welfare of the community: "They have denigrated politicians and others who seek to protect the quality of life for residents of the Village of Woodsburgh and surrounding areas."

314.    In another open letter to the community, Mayor Israel wrote "[b]e assured that the Village of Woodsburgh is actively and proactively working to maintain the charm and character for which we are known."

iii.     *The Villages Selectively Enforced Village Codes and Rules Against the Woodmere Club*

315.     In addition to the many efforts to destroy Plaintiffs' property rights since Plaintiffs acquired the Property, both Woodsburgh and Lawrence officials have taken countless retaliatory measures to impose arbitrary and discriminatory burdens, selectively enforcing various village ordinances that the Villages never tried to enforce before, and/or that they never seek to enforce against other similarly situated property owners.

316.     Between 2018 and 2019, under former Mayor Israel's leadership, Woodsburgh issued six appearance tickets to Plaintiffs for conditions that were long-standing and that existed before Plaintiffs acquired the Property, including conditions that existed when Mayor Israel himself was a Woodmere Club board member.

317.     For example, one ticket cited the Woodmere Club for failure to restrict excessive noise for certain A/C equipment, which had been in place for more than 15 years, which predates Plaintiffs' ownership.

318.     In 2013, when Mayor Israel was on the Old Woodmere Club's board, the Club entered into an agreement with a contracting company that allowed the company to park and maintain some of its earth moving vehicles and equipment on the Property overnight in a remote location, far removed from the residences that border the Property.

319.     In 2015, again while former Mayor Israel was on the Old Woodmere Club's board, the Club's management expanded the agreement, allowing the construction company to operate a dirt sifting operation in the area on the Property used for parking. In exchange, the company provided the Old Woodmere Club with dirt that the Club used in its golf course operations.

320.     This agreement violated Woodsburgh's vehicle and traffic ordinance, Chapter 140, Article III, § 140-26.1(B), an ordinance that prohibits the parking or storing outdoors of any

61

commercial vehicle in residential areas between the hours of 9:00 PM and 8:00 AM, and Chapter 150, Article II, § 150-6(F), a zoning regulation that prohibits the use of residential properties for commercial use.

321.    Despite these long-standing, technical violations of Woodsburgh's codes, there was never any objection from Village officials until 2017, after Plaintiffs purchased the Property and Mayor Israel was threatened with the loss of his personal golf course through Plaintiffs' development plans.

322.    Following Plaintiffs' purchase of the Property, Woodsburgh's Code Enforcement Officer began citing Plaintiffs for violations occasioned by the long-standing agreement with the commercial operator.

323.    Upon information and belief, Woodsburgh never issued citations to the Old Woodmere Club.

324.    Moreover, no other property owner similarly situated to Plaintiffs had previously received tickets for similar conduct.

325.    Woodsburgh's Code Enforcement Officer and Buildings Inspector told the Woodmere Club's general manager that the directive to issue citations came from unnamed "higher-ups."

326.    Upon information and belief, those "higher ups" include, first and foremost, Mayor Israel, who used his power to harass Plaintiffs based on his own personal animus arising out of anger over the future loss of his golf club, as well as because Plaintiffs have tried lawfully to exercise their development rights.

327.    Most recently, in July of 2020, Woodsburgh's Code Enforcement Officer and Buildings Inspector informed the Woodmere Club that he was instructed to ticket the club for

62

violations of certain property maintenance ordinances, claiming that areas of brown grass caused by a heat-wave allegedly violated Woodsburgh's ordinance against "dying" vegetation.

328.   No other Property owner received tickets for brown grass during the heat wave.

329.   Lawrence has also singled out Plaintiffs for selective enforcement actions and unequal and adverse treatment.  In 2019, Plaintiffs received violations on multiple occasions for allegedly violating Lawrence Village Code §144-5B, alleging that Plaintiffs allowed mowing of the golf course and made excessive noise in connection with golf course maintenance before 8:00 AM on weekdays and 9:00 AM on the weekends.

330.   The Old Woodmere Club had engaged in the same practices for years routinely, but was never cited by Lawrence for alleged code violations.  The Club's maintenance personnel simply continued performing their tasks as they always had.

331.   The Village-owned Lawrence Yacht and County Club regularly mows its lawn and performs golf course maintenance at the same times, which would also violate Village Code §144-5B.

332.   Despite such conduct, the Lawrence Yacht and Country Club has never been cited by the village for its violations of Village Code §144-5B.

333.   Lawrence consistently provided favorable treatment to the Lawrence Yacht and Country Club, and selectively enforced its Village Code solely against Plaintiffs and the Woodmere Club.

   **VI.   DEFENDANTS' AND THE TOWN'S CLAIMS THAT THEY SUPPOSEDLY HAD TO ADOPT THE NEW ZONING TO DEAL WITH PURPORTED ENVIRONMENTAL CONCERNS ARE BOGUS – DEFENDANTS AND THE TOWN ARE NOT CONCERNED WITH WHAT THEY CLAIM IS AT ISSUE, ONLY WITH PLAINTIFFS DEVELOPING PLAINTIFFS' PROPERTY**

   **A. At the Same Time that Hempstead Claimed That Defendants and the Town Had to Enact the New Zoning to Counter Traffic Congestion From the**

**Density of Plaintiffs' Proposed Subdivision Plan, It was Pushing Through a Sweeping "Transit-Oriented" Rezoning That Would Dramatically Increase Density and Traffic Congestion Far Beyond that Under Plaintiffs' Plan**

334.    Although the Town, led by Councilmember Blakeman, now claims that it supposedly needed to adopt the new "Coastal Conservation District – Woodmere Club" zone to address, among other things, the Town's supposed lack of infrastructure and traffic congestion issues caused by the increase in housing units under Plaintiffs' planned Subdivision, in 2019 Councilmember Blakeman spearheaded the rapid approval of a major rezoning initiative adjacent to the Inwood and Lawrence train stations.

335.    The train station rezoning, developed and recommended to the Town by the same Cameron Engineering that is behind the 2018 Proposed Golf Course Zone and the new "Coastal Conservation District – Woodmere Club" zone, encouraged a "mix of housing and commercial uses [...] to meet the demand for a housing prototype for residents" and allowed for 336 new residential units and 19,500 square feet of retail and commercial space to be developed.  The rezoning ordinance was unanimously approved by the Town board on May 7, 2019.

336.    The new rezoning ordinance would cause an increase of approximately 1,000 additional vehicles per day in the most congested area in the Town, as compared to the Subdivision development proposal which placed traffic congestion at just an approximate 500 vehicles per day.

337.

## VII.    AS A RESULT OF THE "COASTAL CONSERVATION DISTRICT - WOODMERE CLUB" ZONE, PLAINTIFFS HAD NO CHOICE BUT TO PURSUE A NEW SUBDIVISION APPLICATION AND VARIANCES

338.    As alleged above, the NCPC will not proceed with the review of any subdivision application that does not comply with the existing zoning.

339.    Because the Defendants and the Town adopted the new "Coastal Conservation District - Woodmere Club" zone, the NCPC halted its review of Plaintiffs' proposed 284-Lot Subdivision Plan under the prior as-of-right zoning and the NCPC will not take any further action on Plaintiffs' original 284-lot subdivision application, which is no longer local-zoning-compliant.

340.    Accordingly, on April 12, 2021, Plaintiffs were therefore left with no other choice but to file with the NCPC a new as-of-right application for subdivision approval to develop the maximum-59 lots (really 54 lots)[5] theoretically left to them (the "59-Lot Subdivision Plan").The 59-Lot Subdivision Plan complies with the requirements of the "Coastal Conservation District-Woodmere Club" zone and, therefore, constitutes a proper proposal for subdivision approval to the NCPC. Nonetheless, the re-zoning of the Property forced Plaintiffs to re-start entirely the subdivision review process at the NCPC. Plaintiff has filed a subdivision application with the NCPC and such application remains under review at this time. The NCPC has yet to schedule a public hearing for "preliminary subdivision approval."

## VII    PLAINTIFFS' APPLICATIONS FOR VARIANCES

341.    In addition to all of the foregoing actions Plaintiffs have taken in an effort to lawfully develop their own private property, on February 15, 2023, Plaintiffs filed building permit applications in both Lawrence and Woodsburgh whereby they seek permission to create building lots for single-family homes within the portions of Plaintiffs' Property where such homes are prohibited by the regulations of the "Coastal Conservation-Woodmere Club" zone. These applications would require the zoning boards of both villages to grant Plaintiffs use variances that would allow Plaintiffs to construct homes in areas where such development is otherwise not

---

[5]    Again, due to engineering issues, the maximum number of lots actually available for development in the areas permitted by the "Coastal Conservation District – Woodmere Club" is just 54, not 59.

permitted ("the Variance Applications")Plaintiffs were forced to file the Variance Applications as a result of Defendants' claim that Plaintiffs takings claims could not be deemed final unless and until Plaintiffs sought permission to build in the non-buildable sections of Plaintiffs' Property.  .

342.    Plaintiffs, however, believe that both *Pakdel v. City & County of San Francisco,* 141 S. Ct. 2226 (2021) and *Sherman v. Town of Chester*, 752 F.3d 554, 561-62 (2d Cir. 2014) relieve them of the necessity of seeking variances that, under these circumstances, cannot legally be granted and are not necessary for the purposes of the ripeness of Plaintiffs' claims. Nonetheless, Plaintiffs submitted the Variance Applications out of an abundance of caution.

343.    After extensive discussions with both Defendants about the nature and purpose of Plaintiffs' applications, Defendants' Building Departments denied the applications, clearing the way for Plaintiffs to appeal such denials to the respective zoning boards of appeals of each Defendant. Plaintiffs submitted applications for variances with the zoning boards of both Defendants in late April 2023.

344.    The Lawrence Board of Appeals ("Lawrence Appeals Board") calendared a hearing on Plaintiffs' application to construct single-family homes within the portion of the "Open Space Subdistrict" located in Lawrence for June 22, 2023. Just prior to the hearing date, however, the Lawrence Appeals Board informed Plaintiffs that it would adjourn the hearing on the grounds that the Lawrence Village Hall could not accommodate the large crowd of Lawrence residents expected to appear in opposition to Plaintiffs' application.

345.    The Lawrence Appeals Board adjourned the hearing until July 19, 2023. At that time, the Lawrence Appeals Board held a public hearing on Plaintiffs' application in a special meeting room at the local country club in order to accommodate the large crowd that appeared to oppose Plaintiffs' application. The Lawrence Appeals Board selected a single member of the board

66

to interrogate Plaintiffs' counsel in a hostile manner regarding the application. After Plaintiffs completed their presentation, the Lawrence Appeals Board polled the members of the public at the hearing on their opinion of the application. When asked for a show of hands to indicate opposition, every person in the room raised his/her hand.

346.    At that point, the Lawrence Appeals Board conferred in executive session. The board members returned to the public and announced their intention to adjourn the matter on the grounds that the Lawrence Appeals Board wished to ask the zoning boards of Woodsburgh and the Town to hold a joint session of all three boards to consider, at one time, the applications pending for zoning relief in each of the Municipalities. The Lawrence Appeals Board adjourned the matter without setting a subsequent date for its continued consideration.

347.    After the adjournment, the Lawrence Appeals Board sent requests for a joint hearing to Woodsburgh and the Town. In August 2023, Woodsburgh rejected the request. Upon information and belief, the Town has ignored it.

348.    As such, since Woodsburgh rejected the proposed joint hearing, on August 9, 2023, Plaintiffs asked the Lawrence Appeals Board to close the record on Plaintiffs' application and to render a determination on the application within the timeframe provided by law. The Lawrence Appeals Board, however, has not committed to close the hearing and to take action thereon and has not indicated when, or under what circumstances, it would do so.

349.    For its part, the Woodsburgh Board of Zoning Appeals ("Woodsburgh Appeals Board") calendared a date for a public hearing on August 2, 2023. However, in similar fashion to the Lawrence Appeals Board, the day before the scheduled hearing, the Woodsburgh Appeals Board announced that it would adjourn the matter. The Woodsburgh Appeals Board based its adjournment on the claim that it required a series of technical engineering and design information

67

from Plaintiffs before it would convene a hearing, even though Plaintiffs had submitted all the materials required for a complete application to the Woodsburgh Appeals Board, including a "full" or "long form," environmental assessment form.

350.    Plaintiffs objected to the adjournment and the demand for these additional materials, as such materials relate to design and engineering matters, not to the question of whether Plaintiffs are entitled to zoning relief enabling them to construct homes within the "Open Space Subdistrict."

351.    While the members of a zoning board are entitled to question any applicant about the nature of a request for relief at a public hearing, a board cannot condition its consideration of an application on its receipt of specific information in advance of holding a hearing, particularly where the requested information largely pertains to planning and engineering matters, such as grading and drainage, that are outside the scope of the zoning board's purview.

352.    The Woodsburgh Appeals Board adjourned Plaintiffs' application to September 20, 2023, although it is not clear whether the Woodsburgh Appeals Board will permit Plaintiffs to proceed at that time.

353.    Thus, seven months after Plaintiffs filed their initial building permit applications seeking to create lots within the "Open Space Subdistrict," neither the Lawrence Appeals Board nor the Woodsburgh Appeals Board has rendered a determination on the applications.

354.    The foregoing demonstrates that Defendants have continued to delay, adjourn, and avoid rendering a determination on Plaintiffs' unpopular applications for zoning relief. Such actions have frustrated the purpose of these applications and make apparent that neither Defendant intends to grant any zoning relief in favor of Plaintiffs that would allow Plaintiffs to build within the "Open Space Subdistrict." It is equally apparent that neither the Lawrence Appeals Board nor

68

the Woodsburgh Appeals Board wishes to be responsible for formally denying Plaintiffs' requested relief.

356. Plaintiffs followed the legal process for applying for, and securing, zoning relief and diligently prosecuted their applications. Defendants, however, have obstructed the process as outlined above.

356. Therefore, since it is clear that Defendants have no intention of granting zoning relief to Plaintiffs that would allow Plaintiffs to derive any economic benefit from the land within the "Open Space Subdistrict," Plaintiffs' takings claims are ripe and final.  The Supreme Court made clear in *Pakdel v. City & County of San Francisco,* 141 S. Ct. 2226 (2021), that property owners are not required to go through the motions of seeking administrative relief when the outcome is known in advance.  The Second Circuit Court of Appeals presciently reached the same conclusion as *Pakdel* in *Sherman v. Town of Chester*, 752 F.3d 554, 561-62 (2d Cir. 2014).  In light of the Defendants' and the Town's long history of frustrating the Plaintiffs' efforts to develop the Property (including engaging in actions already held by the New York state courts to be unconstitutional) it is clear that they will continue to do all in their power to stifle development of the Property.  More is not required of the Plaintiffs.

357. Moreover, Defendants and the Town designed the "Coastal Conservation District-Woodmere Club" zone as, in essence, a planned community, specifying where development may occur, where roads may run, and placing off limits an entire "Open Space Subdistrict" that exists to ensure that huge sections of the Property remain free of residential development.

358. Plaintiffs' variance applications ask the zoning boards to exceed the scope of their authority, since these applications effectively request that the zoning boards rezone large swaths

of the Property to allow residential development where the zoning regulations expressly prohibit such development, something the zoning boards are not allowed to do under well settled law.

359.    Specifically, New York law provides that a zoning board of appeals has no power to remake a zoning map under the guise of granting a variance because such a change constitutes an exercise of legislative power, something that a zoning board of appeals does not possess. A variance may be regarded as a zoning amendment if it alters in any fundamental and substantial respect the zoning scheme which is articulated in the ordinance. In determining whether the zoning province of the legislative body has been invaded, size is a significant factor for the variance which most closely resembles an amendment is one which applies to a large or extensive tract of land. Applications for variances which change the density or use of such tracts have been characterized as "futile" and will not receive judicial approval. *Cohalan v. Schermerhorn*, 77 Misc. 2d 23, 24–25 (Sup. Suffolk Ct. 1973); *Levitt v. Inc. Vill. of Sands Point*, 6 N.Y.2d 269, 273 (1959) ("Indeed, an application for a variance here, in effect to rezone 127 acres, would be futile, since the Zoning Board of Appeals has no power to remake the zoning map under the guise of granting a variance.").

## FIRST CAUSE OF ACTION

### DENIAL OF EQUAL PROTECTION
*U.S. Const. Amend. XIV; 42 U.S.C. § 1983; N.Y. Const. Art. I, §11*

360.    Plaintiffs repeat and re-allege paragraphs 1-359 as if fully set forth herein.

361.    The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution requires that all persons subjected to legislation shall be treated alike, under like circumstances and conditions, both in privileges conferred and in liabilities imposed.

362.    The Equal Protection Clause of Article I, § 11 of the New York State Constitution provides that "[n]o person shall be denied the equal protection of the laws of this state or any subdivision thereof."

363. The purpose of the Equal Protection Clause under both the United States and New York Constitutions is to secure the right of every person within the State's jurisdiction to be free of intentional and arbitrary discrimination, whether occasioned by the express terms of a statue or by its improper execution through duly constituted agents of government.

364. A claim for a violation of Equal Protection under 42 U.S.C. § 1983 is stated where similarly situated property owners are not subject to such treatment and that defendants lacked a rational basis for their disparate treatment.

365. The "Coastal Conservation District – Woodmere Club" zone both on its face (as apparent from its name) and as applied, intentionally, arbitrarily, and irrationally singles out Plaintiffs and their Property for unfair and illegal treatment, by unreasonably requiring Plaintiffs to submit to controls not imposed on other similarly situated properties.

366. The "Coastal Conservation District – Woodmere Club" zone, which unconstitutionally singles out Plaintiffs and their Property, fails to advance any legitimate government purpose.

367. The "Coastal Conservation District – Woodmere Club" zone must therefore be declared by this Court as a violation of the Equal Protection Clause of the United States and New York Constitutions, and null, void, and unenforceable.

368. In the alternative, Plaintiffs are entitled to recover from Defendants, jointly and severally, compensatory damages in an amount to be determined at trial as a result of Defendants conspiring together to deprive Plaintiffs of their Constitutional rights.

369. As a result of Defendants' conduct in violation of §1983, Plaintiffs are also entitled to an award of attorneys' fees pursuant to 42 U.S.C. §1988 based on the reasonable value of legal services rendered to and payable by Defendants.

## SECOND CAUSE OF ACTION

### VIOLATION OF THE TAKINGS CLAUSE – UNDUE DELAYS
*U.S. Const. Amend. V and XIV; 42 U.S.C. § 1983; N.Y. Const. Art. I, §7*

370.    Plaintiffs repeat and re-allege paragraphs 1-369 as if fully set forth herein.

371.    The Takings Clause of the Fifth Amendment of the United States Constitution, made applicable to Defendants by the Fourteenth Amendment of the United States Constitution, affords protection from a government entity seizing property unjustly.

372.    Specifically, the Fifth Amendment of the Constitution provides that no person shall "be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."  U.S. Const. Amend. V.

373.    The Takings Clause of the New York State Constitution provides that "Private property shall not be taken for public use without just compensation."

374.    The Takings Clause "'is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536–37 (2005) (quoting *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 315 (1987) (emphasis in original)).

375.    Temporary takings which deprive a landowner of the use of his or her property "are not different in kind from permanent takings, for which the Constitution clearly requires compensation." *First English*, 482 U.S. at 318.

376.    Defendants, acting under the color of state law, have intentionally, arbitrarily, and maliciously delayed and continued to delay Plaintiffs from moving forward with their development project. As set forth in detail above, since the time that Plaintiffs acquired the Property in 2017,

72

Defendants have engaged in a consistent pattern of conduct that has completely deprived Plaintiffs of their ability to use, enjoy and develop the Property.

377.    Defendants enacted a moratorium against development; changed the zoning regulations after Plaintiffs had filed an application to subdivide the Property pursuant to the original zoning, forcing Plaintiffs' to abandoned their original development plan; restricted Plaintiffs' ability to develop 80% of the Property; and have engaged in endless bureaucratic delays and stall tactics intended to frustrate Plaintiffs' ability to successful prosecute and complete any plan for the development of the Property.

378.    As a result, for the past six years, Plaintiffs have been unable to develop the Property and have lost all beneficial use thereof.

379.    Defendants' conduct as aforesaid is not based upon the reasonable exercise of administrative authority but rather designed to cause damage and injury to Plaintiffs, by temporarily depriving Plaintiffs of their constitutional rights to enjoy and make reasonable, economical use of the Property.

380.    Said temporary loss of the enjoyment and use of their Property occasioned by Defendants' unreasonable delay tactics constitutes a concrete and compensable harm.

381.    Accordingly, Plaintiffs are entitled to recover damages from Defendants compensating Plaintiffs for the temporary taking and inverse condemnation of Plaintiffs' Property as set forth in *First English Evangelical Lutheran Church v. Los Angeles County*, 482 U.S. 304 (1987), in an amount to be determined at trial.

382.    As a result of Defendants' conduct in violation of 42 U.S.C §1983, Plaintiffs are also entitled to an award of attorneys' fees pursuant to 42 U.S.C. §1988 based on the reasonable value of legal services rendered to and payable by Defendants.

73

**THIRD CAUSE OF ACTION**

**VIOLATION OF THE TAKINGS CLAUSE – TAKING OF PROPERTY**
*U.S. Const. Amend. V and XIV; 42 U.S.C. § 1983; N.Y. Const. Art. I, §7*

383.    Plaintiffs repeat and re-allege paragraphs 1-382 as if fully set forth herein.

384.    The Defendants' actions violate the constitutional takings clauses both as applied and on their face.  Facially, the question is whether there is any way to apply the "Coastal Conservation District – Woodmere Club" zone that satisfies the Fifth Amendment's just compensation guaranty.  The answer is "no."  As shown, the zoning was designed to preclude productive development, and it does so.  No development is allowed that does not (1) dedicate the vast majority of the Property's acreage to public use; (2) freeze the existing clubhouse in its existing, non-productive, use, while stripping the surrounding land of other use; (3) eliminate the ability to productively develop the vast majority of the Property; (4) radically increase the development costs on the supposedly remaining lots to the point that development is not economically feasible; (5) provide flood control works (with perpetual upkeep and maintenance) that cost millions of dollars and benefit only the surrounding neighborhoods, but not the Property itself; and (6) ignore the Plaintiffs' distinct investment backed expectations for use and development of the Property when they spent millions of dollars to purchase it (including taking over substantial debt and continuing to operate the club at a loss for years) in the belief that it could be developed in the same manner as the neighboring properties.  In sum, because of the draconian restrictions the "Coastal Conservation District – Woodmere Club" zone places on the Property, there is no way to apply them that allows the kind of development guaranteed by the Fifth Amendment.  The Property has been taken for public use and this Court should so declare.  As shown hereafter, the Defendants' actions also violate the takings and just compensation guarantees

74

as applied.  In other words, if one assumes *arguendo* that the new zoning is not facially void, then the way it is applied also violates all standard tests for takings.

385.    The Takings Clause of the Fifth Amendment of the United States Constitution, made applicable to Defendants by the Fourteenth Amendment of the United States Constitution, provides that "[n]or shall Private property be taken for public use without just compensation."

386.    The Takings Clause of the New York State Constitution provides that "Private property shall not be taken for public use without just compensation."

387.    In New York, the term public use broadly encompasses any use which contributes to the health, safety and general welfare of the public.

388.    As applied, the "Coastal Conservation District – Woodmere Club" zone interferes with and destroys legitimate investment-backed expectations of Plaintiffs by preventing them from subdividing and developing the Property, and takes away Plaintiffs' ability to develop 80% of the acreage on the Property that Plaintiffs formerly had the right to develop.  Defendants and the Town further designated 95% of that reduction (approximately 80 acres) to be set aside as "parkland" on which all building and other productive economic uses of any kind are prohibited.

389.    As a result of the adoption of the "Coastal Conservation District – Woodmere Club" zone, not only have the Defendants and the Town dramatically reduced the available lots to develop from 284 to 59, Defendants and the Town have almost tripled the hard construction costs allocable to each lot as compared to the prior zoning, and thus substantially reduced the value of each buildable lot under the new zone.

390.    In addition to that, under the terms of the "Coastal Conservation District – Woodmere Club" zone, Plaintiffs are required to expend approximately $3 million dollars to install flood mitigation improvements and thereafter annually expend substantial funds to maintain those

flood control improvements, as well as the approximately 80 acres of undevelopable open space "parkland," solely for the benefit of the residents living within the vicinity of Plaintiffs' Property and not for themselves.

391.    And, the Defendants and the Town have mandated that Plaintiffs permit such flood mitigation measures and equipment to remain as a permanent physical presence on Plaintiffs' Property in perpetuity.

392.    By saddling the 59 lots that remain theoretically available for development with almost triple the costs to develop and mandating the installation and maintenance of costly flood mitigation equipment in the "parkland" areas, the Defendants and the Town have intentionally made it economically unfeasible for Plaintiffs to develop the Property, and thus taken economically beneficial and productive uses of it.

393.    The Woodsburgh version of the "Coastal Conservation District – Woodmere Club" zone effects a taking of Plaintiffs' Property under the standard set forth in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978).

394.    The Woodsburgh version of the "Coastal Conservation District – Woodmere Club" zone is an unconstitutional taking of Plaintiffs' Property without compensation.  The "Coastal Conservation District – Woodmere Club" zone must therefore be declared by this Court as invalid under the Takings Clause of the Fifth Amendment of the United States Constitution and the New York State Constitution.

395.    In the alternative, as a direct and proximate consequence of Woodsburgh's taking under the "Coastal Conservation District – Woodmere Club" zone, Plaintiffs are entitled to just compensation in an amount to be established at trial based on the difference between the pre and post regulation value difference, currently estimated to be at least $40 million dollars.

76

396.    The "Coastal Conservation District – Woodmere Club" zone has eliminated 100% of the building lots situated within Lawrence, thereby depriving Plaintiffs of all economically beneficial use of that portion of their Property.  As such, the Lawrence version of the "Coastal Conservation District – Woodmere Club" zone effects a taking of Plaintiffs' Property under the standard set forth in *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003 (1992).

397.    In the alternative, the Lawrence version of the "Coastal Conservation District – Woodmere Club" zone effects a taking of Plaintiffs' Property under the standard set forth in *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978).

398.    The Lawrence version of the "Coastal Conservation District – Woodmere Club" must therefore be declared by this Court as invalid under the Takings Clause of the Fifth Amendment of the United States Constitution and the New York State Constitution.

399.    In the alternative, as a direct and proximate consequence of the Lawrence's taking under the "Coastal Conservation District – Woodmere Club" zone, Plaintiffs are entitled to just compensation in an amount to be established at trial based on the pre-and post-regulation value difference of the Property, currently estimated to be at least $25 million dollars.

400.    As a result of Defendants' conduct in violation of 42 U.S.C §1983, Plaintiffs are also entitled to an award of attorneys' fees pursuant to 42 U.S.C. §1988 based on the reasonable value of legal services rendered to and payable by Defendants.

## FOURTH CAUSE OF ACTION

### UNCONSTITUTIONAL CONDITIONS / EXACTIONS
*U.S. Const. Amend. V and XIV; 42 U.S.C. § 1983*

401.    Plaintiffs repeat and re-allege paragraphs 1-400 as if fully set forth herein.

402.    Through the "Coastal Conservation District – Woodmere Club" zone Defendants and the Town have taken 83 acres of Plaintiffs' Property for "parkland" through a conservation

77

easement, which is tantamount to a direct appropriation or ouster under *Lingle v. Chevron,* 544 U.S. 528, 537-38 (2005).

403.   Under the terms of the "Coastal Conservation District – Woodmere Club" zone, Plaintiffs are required to expend approximately $3 million dollars to install flood mitigation improvements and thereafter annually expend substantial funds to maintain over 70% of the Property that falls within the Open Space District, solely for the benefit of the residents living within the vicinity of Plaintiffs' Property and not for themselves.

404.   By restricting Plaintiffs to using that portion of the Property solely for open space, the "Coastal Conservation District – Woodmere Club" zone is forcing Plaintiffs to maintain over 70% of the Property to achieve conservation purposes for the public at Plaintiffs' sole cost.

405.   Moreover, Plaintiffs are foreclosed from developing any of the other approximate 30% of the Property unless they spend that money solely for the public.

406.   These conditions, which apply to no other property within the Municipalities, have prevented Plaintiffs from exercising their fundamental rights as property owners.

407.   Plaintiffs have suffered significant economic harm as a result of conditions the "Coastal Conservation District – Woodmere Club" zone places on their Property, and will continue to do so each and every day that these unconstitutional conditions exacted from them by the Defendants remain in effect.

408.   This uncompensated exacting of an easement on the Plaintiffs' Property solely for the benefit of the public as a condition on developing what remains of the Property, while placing the financial and other burdens of ownership solely upon Plaintiffs, constitutes an unconstitutional exaction under *Nollan v. California Coastal Commission*, 483 U.S. 825 (1987), *Dolan v. City of*

*Tigard*, 512 U.S. 374 (1994), and *Koontz v. St. Johns River Water Management District*, 133 S. Ct. 420 (2013).

409.    As a result of Defendants' imposition of unconstitutional conditions under the "Coastal Conservation District – Woodmere Club" zone, the ordinance must therefore be deemed by this Court invalid under the Fifth Amendment of the United States Constitution.

410.    In the alternative, as a direct and proximate consequence of Woodsburgh's imposition of unconstitutional conditions under the "Coastal Conservation District – Woodmere Club" zone, Plaintiffs are entitled to just compensation in an amount to be established at trial, but at least $40 million dollars.

411.    In the alternative, as a direct and proximate consequence of Lawrence's imposition of unconstitutional conditions under the "Coastal Conservation District – Woodmere Club" zone, Plaintiffs are entitled to just compensation in an amount to be established at trial, but at least $25 million dollars.

412.    In addition, in the event the "Coastal Conservation District – Woodmere Club" zone is deemed invalid, Plaintiffs are still entitled to recover damages from Defendants, jointly and severally, as a result of Defendants' placement of temporary unconstitutional conditions on Plaintiffs' Property as set forth in *First English Evangelical Lutheran Church v. Los Angeles County*, 482 U.S. 304 (1987), in an amount to be determined at trial.

413.    As a result of Defendants' conduct in violation of 42 U.S.C. §1983, Plaintiffs are also entitled to an award of attorneys' fees pursuant to 42 U.S.C. §1988 based on the reasonable value of legal services rendered to and payable by Defendants.

**FIFTH CAUSE OF ACTION**

**VIOLATION OF THE DUE PROCESS CLAUSE**
*U.S. Const. Amend. V and XIV; 42 U.S.C. § 1983;  N.Y. Const. Art. I, §6*

414.    Plaintiffs repeat and re-allege paragraphs 1-413 as if fully set forth herein.

415.    The due process protections guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section Six to the New York State Constitution guaranty that no citizen can be deprived of property without due process of law.

416.    Plaintiffs have a constitutionally protected cognizable property right under New York law in the property they own.

417.    Indeed, because applying for subdivision approval at the NCPC is required before Plaintiffs could commence any development on their Property, the two years, and more than $2 million is the equivalent of commencing "substantial construction" required to obtain a vested right in the zoning applicable to the Property immediately prior to the Defendants' and the Town's adoption of the "Coastal Conservation District – Woodmere Club" zone.

418.    Moreover, Plaintiffs also have a vested right in such prior zoning for the reasons set forth herein.

419.    Specifically, by engaging in the scheme set forth above, including without limitation, circumventing the NCPC's Subdivision review after allowing Plaintiffs to spend approximately $2 million dollars pursuing the process, adopting the "Coastal Conservation District – Woodmere Club" zone, and at all times providing an empty, meaningless process, with a pre-determined outcome, *i.e.* to thwart the Subdivision approval – Defendants intentionally and impermissibly deprived Plaintiffs of their property interest without due process of law.

420.    Defendants unduly delayed Plaintiffs' ability to receive subdivision approval under the process applicable at the NCPC by enacting and maintaining unconstitutional moratoria.

421.    They also unduly delayed their actions in connection with Plaintiffs' application through the imposition of unconstitutional moratoria.

422.    The Municipalities intentionally waited until virtually the conclusion of the SEQRA review process to adopt the "Coastal Conservation District – Woodmere Club" zone, all in an effort to thwart approval of Plaintiffs' proposed 284-Lot Subdivision Plan by the NCPC and prevent Plaintiffs' rights to the existing zoning status from vesting.

423.    As set forth above, while the principal justification for the "Coastal Conservation District – Woodmere Club" zone is allegedly the need to limit development within sensitive flood zones, the Single Family District allows residential development almost exclusively in areas of the Property that lie within a flood zone.

424.    Conversely, the Open Space District prohibits development in parts of the Property that are not within a flood zone.

425.    The design of the subdistricts has nothing to do with flooding or any other justification to which Defendants and the Town point merely as pretext; the design is simply intended to mandate the maintenance of a huge buffer around the outer areas of the Property, in which, for no legitimate purpose and without any rational basis, Plaintiffs are prohibited from developing the Property.

426.    Defendants violated Plaintiffs' substantive due process rights and conspired amongst themselves to do so, taking numerous steps in furtherance of their conspiracy.

427.    Defendants acted willfully, knowingly, and with the specific intent to deprive Plaintiffs of their constitutional rights secured by 42 U.S.C. § 1983.

81

428. The "Coastal Conservation District – Woodmere Club" zone must therefore be declared by this Court as a violation of the Due Process Clause of the United States and New York Constitutions and therefore invalid.

429. In the alternative, Plaintiffs are entitled to recover from Defendants, jointly and severally, compensatory damages in an amount to be determined at trial as a result of Defendants conspiring together to deprive Plaintiffs of their Constitutional rights.

430. As a result of Defendants' conduct in violation of 42 U.S.C. §1983, Plaintiffs are also entitled to an award of attorneys' fees pursuant to 42 U.S.C. §1988 based on the reasonable value of legal services rendered to and payable by Defendants.

## SIXTH CAUSE OF ACTION

### VIOLATION OF BAN ON BILL OF ATTAINDER
*U.S. Const., Art. I, § 10*

431. Plaintiffs repeat and re-allege paragraphs 1-430 as if fully set forth herein.

432. Article I, § 10 of the United States Constitution provides that "'[n]o State shall… pass any Bill of Attainder."

433. A constitutionally proscribed bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468 (1977); *see also United States v. Lovett*, 328 U.S. 303, 315 (1946) ("[L]egislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution.").

434. The "Coastal Conservation District – Woodmere Club" zone violates the prohibition against Bills of Attainder because it applies with specificity and constitutes legislative punishment.

82

435.    The "Coastal Conservation District – Woodmere Club" zone is targeted specifically at Plaintiffs and their Property.

436.    The "Coastal Conservation District – Woodmere Club" zone constitutes punishment because of the severity of the burdens it imposes on Plaintiffs and their Property, and it cannot be said to further any non-punitive legislative purpose.

437.    The "Coastal Conservation District – Woodmere Club" zone constitutes punishment because Defendants' and the Town's long history of frustrating development of the Property evinces a legislative motivation to punish Plaintiffs.

438.    The "Coastal Conservation District – Woodmere Club" zone must therefore be declared by this Court as an unlawful Bill of Attainder in violation of Article I, § 10 of the United States Constitution and void.

## SEVENTH CAUSE OF ACTION

### UNLAWFUL AND *ULTRA VIRES* EXERCISE OF ZONING POWER

439.    Plaintiffs repeat and re-allege paragraphs 1-438 as if fully set forth herein.

440.    In New York, the zoning power is a power granted to local municipalities by the State Legislature and is governed by statute.

441.    A local municipality may not exercise the zoning power unless that exercise conforms to the scope, nature and purpose ascribed to the zoning power.

442.    A municipality may only adopt zoning enactments when such enactments are part of, and consonant with, a well-considered land use plan.

443.    In New York, the planning power is a separate power, distinct from the zoning power, devolved upon local municipalities by statute.

444.    In Nassau County, the planning power over subdivision applications is vested solely in the NCPC and in village planning boards. Towns within Nassau County do not have subdivision review authority.

445.    New York's Court of Appeals in *Golden v. Planning Bd. of Town of Ramapo*, 30 N.Y.2d 359, 372 (N.Y. 1972) describes the zoning power as "characteristically ineffective" for addressing the sound development of a single parcel and emphasizes the distinct purposes and independent ambits of the zoning and planning powers.

446.    In enacting the "Coastal Conservation District–Woodmere Club" ordinance, Defendants engaged in illegal, *ultra vires* actions that exceed the proper limits of the zoning power. They have adopted zoning regulations that are not part of, or related to, a well-considered comprehensive plan and they have improperly adopted and implemented planning power through a zoning ordinance.

447.    As a result, the "Coastal Conservation District – Woodmere Club" must be invalidated in its entirety.

448.    Plaintiffs are entitled to a declaratory judgment that the "Coastal Conservation District – Woodmere Club" is an *ultra vires* act, and thus null, void and unenforceable.

### EIGHTH CAUSE OF ACTION

#### UNLAWFUL AND *ULTRA VIRES ULTRA VIRES* ACTION IN CONNECTION WITH "CLUBHOUSE SUB-DISTRICT"

449.    Plaintiffs repeat and re-allege paragraphs 1-448 as if fully set forth herein.

450.    The creation and enforcement of the "Clubhouse-Hospitality Sub-District" under Woodsburgh's version of the "Coastal Conservation District – Woodmere Club," is not, in reality, a zoning district, but is an attempt to use zoning to bestow landmark status upon a perceived historic building.

84

451.    Defendants may not use zoning power to preserve favored structures or uses of land.

452.    Further, there is no New York law that authorizes a municipality to use zoning power to enact landmarking legislation.

453.    The Clubhouse-Hospitality Sub-District, which commits Plaintiffs to preserving the "historic" clubhouse, is an improper effort to enact landmarking legislation through the guise of zoning and thus *ultra vires*, improper and invalid.

454.    Section 150-109 of Woodsburgh's version of the "Coastal Conservation District – Woodmere Club" zone provides that: "[i]f §150-110 [Subdistricts Established] or §150-111 [Permitted Uses] of this Article shall be adjudged by a court of competent jurisdiction to be invalid, such judgment shall invalidate the remainder of this Article."

455.    Section 76.24 of Hempstead's version of the "Coastal Conservation District – Woodmere Club" zone provides that: "[i]f § 76.25 [Subdistricts Established] or § 76.26 [Permitted Uses] of this Article shall be adjudged by a court of competent jurisdiction to be invalid, such judgment shall invalidate the remainder of this Article."

456.    Section 212-13.1.9 of Lawrence's version of the "Coastal Conservation District – Woodmere Club" zone provides that: "[i]f § 7212-13.1.10 [Subdistricts Established] or § 212-13.1.11 [Permitted Uses] of this Article shall be adjudged by a court of competent jurisdiction to be invalid, such judgment shall invalidate the remainder of this Article."

457.    The "Coastal Conservation District – Woodmere Club" zone must be invalidated in its entirety because the unlawful Clubhouse-Hospitality Sub-District established under the new zone is not severable and each Municipality's respective version of the ordinance expressly

85

provides that its entire ordinance must be declared invalid if any of the "sub-districts" or "permitted uses" are declared invalid.

458.    Plaintiffs are entitled to a declaratory judgment that the "Coastal Conservation District – Woodmere Club" zone is an *ultra vires* act, and thus null, void and unenforceable in its entirety.

## NINTH CAUSE OF ACTION

### ADOPTION OF LOCAL LAWS INCONSISTENT WITH SEQRA

459.    Plaintiffs repeat and re-allege paragraphs 1-458 as if fully set forth herein.

460.    Under New York law, all determinations relating to environmental issues in connection with determinations by agencies in the State of New York must be made solely through the SEQRA process.

461.    Once the SEQRA process was underway in connection with Plaintiffs' Subdivision application, Defendants were required to address any and all of their purported environmental concerns solely through the SEQRA process.

462.    By purporting to adopt new zoning to address environmental concerns and pulling the rug out from under the NCPC on the very eve of the closing of public comment on Plaintiffs' DEIS, Defendants have unlawfully preempted the SEQRA process and their new zoning, ostensibly enacted to address these environmental issues, is thus invalid.

463.    In adopting the "Coastal Conservation District – Woodmere Club" zone Defendants have exceeded their authority and as a result the new zone must be invalidated in its entirety.

464.    Plaintiffs are entitled to a declaratory judgment that the "Coastal Conservation District – Woodmere Club" zone is an *ultra vires* act, and thus null, void and unenforceable in its entirety.

**TENTH CAUSE OF ACTION**

**USE OF THE ZONING POWER IN VIOLATION OF PLAINTIFFS' RIGHT TO DUE PROCESS OF LAW**

465.    Plaintiffs repeat and re-allege paragraphs 1-464 as if fully set forth herein.

466.    In the exercise of their zoning powers, Defendants may not entirely frustrate the right of the owner of real property to use and enjoy its land and to receive reasonable economic benefits therefrom.

467.    The "Open Space/Recreation Subdistrict" governs approximately 80% of the area of the Property. The "Open Space/Recreation Subdistrict" permits only two uses: (i) golf courses and (ii) "passive parkland" uses, such as "walking trails."

468.    While the regulations of the "Open Space Subdistrict" purport to allow Plaintiffs to operate a "golf course", the configuration of the Property within the "Open Space Subdistrict" renders it a practical impossibility to create a golf course of any kind on the Property.

469.    Moreover, a golf course is not a permitted use within the other two subdistricts erected under the "Coastal Conservation-Woodmere Club" zone, and, as such, the sections of the Property within the other subdistricts could not be joined with any section within the "Open Space Subdistrict" to create a functional golf course.

470.    Other than a golf course, the "Open Space Subdistrict" does not allow Plaintiffs any productive use of the section of the Property under its jurisdiction, limiting Plaintiffs to "passive recreation uses", such as walking trials, effectively transforming the "Open Space Subdistrict" into the equivalent of a public park, but placing the burden of the maintenance of this recreation area upon Plaintiffs and their successors.

471.    The complete frustration of Plaintiffs' ability to use, enjoy and benefit from the section of the Property governed by the "Open Space/Recreation Subdistrict", the regulations of

87

which effectively force Plaintiffs to maintain private property for a public benefit, constitutes an illegal application of the zoning power that deprives Plaintiffs' of their rights in private property without due process of law. Such a zoning enactment is "unreasonable and, therefore, unconstitutional because, without due process of law, it deprives the owner of all his property rights, except the bare title and a dubious future reversion of full use." *Fred F. French Investing Co. v. City of New York*, 39 N.Y.2d 587, 597 (1976).

472.   Defendants acted willfully, knowingly, and with the specific intent to deprive Plaintiffs of their constitutional rights secured by 42 U.S.C. § 1983.

473.   The regulations of the "Open Space/Recreation Subdistrict" of the "Coastal Conservation District – Woodmere Club" zone must therefore be declared by this Court as a violation of the Due Process Clause of the United States and New York Constitutions and therefore invalid.

474.   In the alternative, Plaintiffs are entitled to recover from Defendants, jointly and severally, compensatory damages in an amount to be determined at trial as a result of Defendants conspiring together to deprive Plaintiffs of their Constitutional rights.

475.   As a result of Defendants' conduct in violation of 42 U.S.C. §1983, Plaintiffs are also entitled to an award of attorneys' fees pursuant to 42 U.S.C. §1988 based on the reasonable value of legal services rendered to and payable by Defendants.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs requests judgment against Defendants as follows:

A. On the First Cause of Action, declaring, adjudging and decreeing that the "Coastal Conservation District – Woodmere Club" zone is null, void and unenforceable, or in the alternative awarding Plaintiffs compensatory damages against Defendants,

88

in an amount to be determined at trial, plus attorneys' fees and costs as provided by 42 U.S.C. §§ 1983 and 1988;

B.  On the Second Cause of Action, awarding Plaintiffs compensation resulting from their inability to use and enjoy their Property as set forth in *First English Evangelical Lutheran Church v. Los Angeles County*, 482 U.S. 304 (1987), as well as their attorneys' fees and costs pursuant to 42 U.S.C. §1988;

C.  On the Third Cause of Action, declaring, adjudging and decreeing that the "Coastal Conservation District – Woodmere Club" zone is null, void and unenforceable in its entirety, and awarding Plaintiffs just compensation against Defendants, jointly and severally, in an amount to be determined at trial, but at least $65 million dollars, plus attorneys' fees and costs as provided by 42 U.S.C. §§ 1983 and 1988;

D.  On the Fourth Cause of Action, declaring, adjudging and decreeing that the "Coastal Conservation District – Woodmere Club" zone is null, void and unenforceable in its entirety, and awarding compensation resulting from their inability to use and enjoy their Property as set forth in *First English Evangelical Lutheran Church v. Los Angeles County*, 482 U.S. 304 (1987), or in the alternative awarding Plaintiffs just compensation against Defendants, jointly and severally, in an amount to be determined at trial, but at least $65 million dollars, plus attorneys' fees and costs as provided by 42 U.S.C. §§ 1983 and 1988;

E.  On the Fifth Cause of Action, declaring, adjudging and decreeing that the "Coastal Conservation District – Woodmere Club" zone is null, void and unenforceable in its entirety, or in the alternative awarding Plaintiffs compensatory damages against

Defendants, jointly and severally, in an amount to be determined at trial, plus attorneys' fees and costs as provided by 42 U.S.C. §§ 1983 and 1988;

F.  On the <u>Sixth Cause of Action</u>, declaring, adjudging and decreeing that the "Coastal Conservation District – Woodmere Club" zone is an unlawful Bill of Attainder, and thus null, void and unenforceable in its entirety;

G.  On the <u>Seventh Cause of Action</u>, declaring, adjudging and decreeing that the "Coastal Conservation District – Woodmere Club" zone is an *ultra vires* act, and thus null, void and unenforceable in its entirety;

H.  On the <u>Eighth Cause of Action</u>, declaring, adjudging and decreeing that the "Coastal Conservation District – Woodmere Club" zone is an *ultra vires* act, and thus null, void and unenforceable in its entirety; and

I.  On the <u>Ninth Cause of Action</u>, declaring, adjudging and decreeing that the "Coastal Conservation District – Woodmere Club" zone is an *ultra vires* act, and thus null, void and unenforceable in its entirety.

J.  On the <u>Tenth Cause of Action</u>, declaring, adjudging and decreeing that the regulations of the "Open Space/Recreation Subdistrict" of the "Coastal Conservation District – Woodmere Club" zone are null, void and unenforceable in their entirety, or in the alternative awarding Plaintiffs compensatory damages against Defendants, jointly and severally, in an amount to be determined at trial, plus attorneys' fees and costs as provided by 42 U.S.C. §§ 1983 and 1988;

K.  In addition, awarding Plaintiffs prejudgment interest at the maximum rate allowable by law; and awarding Plaintiffs such other and further relief at law or in equity that the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiffs demand trial by jury of all claims and issues so triable.

Dated: New York, New York
        September 20, 2023              **MEISTER SEELIG & FEIN PLLC**

                                    By:     */s/ Jeffrey Schreiber*
                                    Jeffrey Schreiber, Esq.
                                    Caitlin R. Trow, Esq.

                                    125 Park Avenue, 7th Floor
                                    New York, New York 10017
                                    Tel: (212) 655-3500
                                    Fax: (212) 655-3535
                                    Email: js@msf-law.com
                                                  crt@msf-law.com

                                    *Counsel for Plaintiffs*

91