UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

WG WOODMERE LLC; SG BARICK LLC; and
LH BARICK LLC,

          *Plaintiffs*,

    -against-

THE INCORPORATED VILLAGE OF WOODSBURGH;
THE INCORPORATED VILLAGE OF LAWRENCE;
TOWN OF HEMPSTEAD; COUNTY OF NASSAU;
NASSAU COUNTY PLANNING COMMISSION; and
NASSAU COUNTY DEPARTMENT OF PUBLIC
WORKS,

          *Defendants*.

2:23-CV-6966 (ARR) (AYS)

**OPINION & ORDER**

ROSS, United States District Judge:

In this action, Plaintiffs claim that Defendants violated federal and state law by rezoning a property located in Woodmere, New York ("Property") to limit development. The Property is located within the Town of Hempstead ("Hempstead"), the Village of Lawrence ("Lawrence"), and the Village of Woodsburgh ("Woodsburgh") (together "Municipal Defendants"), and is under the jurisdiction of Defendants County of Nassau, the Nassau County Department of Public Works, and the Nassau County Planning Commission. Hempstead now moves to dismiss Plaintiffs' Second Amended Complaint, ECF No. 66 ("Second Amended Complaint" or "SAC"), arguing that Plaintiffs' claims are not ripe and that the complaint fails to state a takings claim.

Hempstead largely repeats arguments previously raised by Lawrence and Woodsburgh, which I have already addressed in my order granting in part and denying in part their motions to dismiss Plaintiffs' original complaint, ECF No. 43 ("Dismissal Order"). Having reviewed the Second Amended Complaint and the parties' briefing on the instant motion, I DENY Hempstead's

motion to dismiss as to Plaintiffs' takings claims (the second, third, and fourth causes of action) and state law *ultra vires* claims (the seventh and eighth causes of action).

## BACKGROUND

### Factual and Procedural Background

I assume the parties' familiarity with the facts alleged in Plaintiffs' Second Amended Complaint, which I presume to be true. *See Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106, 113 (2d Cir. 2013).

Plaintiffs are the owners of a 118-acre property, formerly a private golf and country club known as the "Woodmere Club," located within the municipalities of the Village of Lawrence, the Village of Woodsburgh, and the Town of Hempstead. SAC ¶ 125. Plaintiffs acquired the Woodmere Club property on April 27, 2017, of which approximately 55 acres are within the jurisdiction of Hempstead, 40.5 acres in Woodsburgh, and 22.9 acres in Lawrence. *Id.* ¶¶ 127, 129. The municipalities are all located within Nassau County, New York, and the Woodmere Club property is subject to the planning authority of the municipalities and the Nassau County Planning Commission ("NCPC"), which reviews and approves subdivision applications for land within the Town of Hempstead. *Id.* ¶¶ 15, 130.

Five months before Plaintiffs acquired the Property, Hempstead adopted Resolution No. 1541-2016 and enacted Section 302(R) to Article XXXI of the Town's Building Zone Ordinance, which imposed a 180-day moratorium on all residential development of golf course properties. *Id.* ¶ 142. The town board extended the moratorium six times. *Id.* ¶ 155. Plaintiffs brought a New York State Court action challenging the constitutionality of the moratorium and its repeated extensions, and on December 26, 2018, the New York Supreme Court found the repeated moratorium extensions to be unconstitutional takings. *Id.* ¶¶ 167–69. In April 2018, Hempstead

proposed zoning plans that would have covered the Woodmere Club property, that were not adopted after public opposition from town residents that wanted no development at all. *Id.* ¶¶ 174–200. Hempstead also considered using its eminent domain power to turn the Woodmere Club property into a town-owned park, but found that town residents did not support raising taxes for that effort. *Id.* ¶¶ 201–17.

In December 2018, Plaintiffs filed an application with the NCPC to subdivide the Property into 284 single family residential lots in compliance with the then-effective zoning regulations of the municipalities. *Id.* ¶¶ 219–20. The NCPC approval process included a review under New York's State Environmental Quality Review Act ("SEQRA"), N.Y. Env't Conserv. Law §§ 8-0101–8-0117 (McKinney 2024). *Id.* ¶ 224. The NCPC is the "Lead Agency" for purposes of the SEQRA review process, and determined that the Woodmere Club property was subject to "the most detailed and extensive form of environmental review provided by law." *Id.* ¶ 225. Plaintiffs expended approximately $2 million in fees and expenses associated with the NCPC application. *Id.* ¶¶ 235–36.

As Plaintiffs moved through the SEQRA process in late 2019 and early 2020, Hempstead entered an Intermunicipal Cooperation Agreement ("ICA") with Defendants Lawrence and Woodsburgh to rezone the Woodmere Club property. *Id.* ¶ 245. Under the ICA, Defendants Hempstead, Lawrence, and Woodsburgh agreed to work together to draft and adopt zoning ordinances that would impose a single zoning scheme on the Woodmere Club property. *Id.* ¶ 246. The three municipalities also adopted by resolution a fee sharing agreement whereby Hempstead "would pay 70% for such incurred legal services and costs" associated with any action brought by Plaintiffs to challenge the enactment of their joint zoning scheme. *Id.* ¶¶ 248–49. Following the ICA, Hempstead introduced its version of the zoning scheme on May 21, 2020, and the

municipalities held a joint public hearing on June 23, 2020. *Id.* ¶¶ 254–55. The "Coastal Conservation District – Woodmere Club" zone ("Challenged Zoning") was formally adopted by Hempstead on July 1, 2020 and went into effect July 20, 2020. *Id.* ¶ 258; ECF No. 66-6 ("Amendment to the Building Zone Ordinance of the Town of Hempstead"). Hempstead's stated purpose for enacting the Challenged Zoning was:

> [T]o regulate development in the environmentally sensitive coastal areas that span the municipal boundaries of the Town and the contiguous Villages of Lawrence and Woodsburgh, including the area occupied by the former Woodmere Club – allowing for the enhanced preservation and protection of the Town's and neighboring Villages' environmental, coastal, open space and cultural resources and the preservation of the residential neighborhoods.

*Id.* ¶ 259.

The Challenged Zoning creates three "subdistricts" covering the Woodmere Club property: the Open Space/Recreation Subdistrict ("Open Space Subdistrict"), the Single-Family Residential Subdistrict ("Single Family Subdistrict"), and the Clubhouse/Hospitality Subdistrict ("Clubhouse Subdistrict"). *Id.* ¶ 264. The Open Space Subdistrict applies to 83.3 acres of the Woodmere Club property, of which 35.7 acres lie within Hempstead's jurisdiction. *Id.* ¶ 274. The subdistrict limits permitted use to an "open space parkland," "passive parkland," or a nine-hole golf course, which Plaintiffs allege provide either zero economic value or are not economically viable uses of the Property. *Id.* ¶¶ 275–76. The zone takes away "more than 90% of the lots available for development" and makes the Property "economically unfeasible" to develop. *Id.* ¶ 288. The Single Family Subdistrict applies to 29.4 acres of the Woodmere Club property, of which 19.3 acres lie within Hempstead's jurisdiction. *Id.* ¶ 290. The zone allows for residential development almost exclusively in areas that lie within a flood zone, whereas the Open Space Subdistrict prohibits development in areas that largely are not within a flood zone. *Id.* ¶ 296. The Clubhouse Subdistrict lies completely within the jurisdiction of Woodsburgh. *Id.* ¶ 306. Under the prior zoning, Plaintiffs

had the right to develop 248 building lots for single family homes within the Town of Hempstead. *Id.* ¶ 267. Under the Challenged Zoning, Plaintiffs are only permitted to develop 41 building lots in Hempstead's jurisdiction, a reduction of 84% from the previous zoning regime. *Id.* ¶ 268. It also requires Plaintiffs to install and maintain flood management equipment, which poses significant engineering costs. *Id.* ¶¶ 43, 272.

On August 24, 2020, Plaintiffs sued the Town of Hempstead and the Villages of Lawrence and Woodsburgh, seeking redress for alleged violations of the U.S. Constitution, the New York Constitution, and New York law. *See WG Woodmere LLC v. Town of Hempstead (Woodmere I)*, No. 20-CV-3903 (E.D.N.Y. Aug 24, 2020). After considering the report and recommendation issued by Magistrate Judge Anne Y. Shields and Defendants' objections to her opinion, I dismissed Plaintiffs' complaint in *Woodmere I* without prejudice on December 1, 2022. *See WG Woodmere LLC v. Town of Hempstead (Woodmere I)*, No. 20-CV-3903, 2022 WL 17359339 (E.D.N.Y. Dec. 1, 2022). I found that Plaintiffs' equal protection and takings claims were not yet ripe because there was still "significant ambiguity" as to how exactly the challenged zoning would "actually apply" to Plaintiffs' property. *Id.* at *4–7. I further held that Plaintiffs' due process claims failed for lack of a protected property interest. *Id.* at *8. I adopted Judge Shields's recommendation to dismiss Plaintiffs' state law claims under SEQRA and the New York state constitution, and I declined to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims given the dismissal of all federal claims. *Id.* at *9.

Following the *Woodmere I* order, Plaintiffs worked to ripen their claim. On February 15, 2023, Plaintiffs filed permit applications in Lawrence, Woodsburgh, and Hempstead, which sought zoning variances to construct homes in areas of their property where the Challenged Zoning prohibited residential development. SAC ¶ 399. All three municipalities denied these applications,

and Plaintiffs appealed the denials to each village's respective zoning board of appeals in April 2023. SAC ¶ 401.

On September 20, 2023, Plaintiffs filed the complaint in the instant action against Lawrence and Woodsburgh, but not Hempstead. The original complaint alleged ten causes of action: (1) a denial of equal protection under the federal and state constitutions; (2) a temporary violation of the takings clause of the federal and state constitutions due to undue delay; (3) a permanent violation of the takings clause of the federal and state constitutions due to a taking of property; (4) the imposition of unconstitutional conditions/exactions under the Federal Constitution; (5) a violation of the due process clause of the federal and state constitutions; (6) an unconstitutional bill of attainder under the Federal Constitution; (7) an unlawful and ultra vires exercise of zoning power; (8) an unlawful and ultra vires action in connection with the Clubhouse District; (9) the adoption of local laws inconsistent with SEQRA; and (10) a use of the zoning power in violation of the due process clause of the federal and state constitutions. ECF No. 1 ¶¶ 360–475. The federal constitutional claims were brought pursuant to 42 U.S.C. § 1983. *Id.*

On September 18, 2024, I issued the Dismissal Order granting in part and denying in part the motions to dismiss filed by Woodsburgh and Lawrence. *See* ECF Nos. 37–43. On November 7, 2024, Plaintiffs filed an Amended Complaint. ECF No. 60. On January 7, 2025, Plaintiffs submitted an unopposed request to amend their complaint to add new parties, which I granted on January 8, 2025. ECF Nos. 64–65. On January 8, 2025, Plaintiffs filed the Second Amended Complaint, which joined the Town of Hempstead as a defendant. ECF No. 66. The Second Amended Complaint acknowledges that it includes Plaintiffs' first, fifth, sixth, ninth, and tenth causes of action only for purposes of preserving their appeal rights, as the Dismissal Order dismissed these claims against both Defendants Woodsburgh and Lawrence. SAC at *87. Indeed,

Plaintiffs and Hempstead stipulated on February 7, 2025 that those causes of action are deemed to have been asserted against Hempstead and dismissed on the same grounds. ECF No. 77.

On April 4, 2025 Hempstead served a motion to dismiss pursuant to Rule 12(b)(1) for lack of subject-matter jurisdiction, Rule 12(b)(6) for failure to state a claim, and Rule 12(c) for judgment on the pleadings. ECF No. 87. On April 24, Plaintiffs served their opposition papers. ECF No. 88. On May 1, Hempstead served its reply papers. ECF No. 91. On May 16, 2025, Plaintiffs and Defendants Hempstead, Woodsburgh, and Lawrence moved to stay proceedings for thirty days, ECF No. 92, and I entered in an order on May 28, 2025 staying proceedings until June 9, 2025. On June 9, 2025, Plaintiffs and Defendants Hempstead, Woodsburgh, and Lawrence moved to stay all pending deadlines in this action until July 15, 2025. *See* ECF No. 93.

## STANDARD OF REVIEW

Hempstead has moved to dismiss under Federal Rule of Civil Procedure 12(b)(1), 12(b)(6), and 12(c). When a defendant moves to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction and also moves to dismiss on other grounds, a reviewing court should consider the Rule 12(b)(1) motion first. *Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990).

A claim is "properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). A Rule 12(b)(1) motion "may challenge either the legal or factual sufficiency of the plaintiff's assertion of jurisdiction, or both." *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 140 (2d Cir. 2001). If the defendant's motion "challenges only the legal sufficiency of the plaintiff's jurisdictional allegations[,] . . . the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of [the] plaintiff." *Id.*

(internal quotation marks and citations omitted); *see also Carter v. HealthPort Tech., LLC*, 822 F.3d 47, 56 (2d Cir. 2016) ("When the Rule 12(b)(1) motion is facial, *i.e.*, based solely on the allegations of the complaint or the complaint and exhibits attached to it . . . the plaintiff has no evidentiary burden."). However, if "jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (internal quotation marks omitted). In such a case, "the party asserting subject matter jurisdiction 'has the burden of proving by a preponderance of the evidence that it exists.'" *Id.* (quoting *Makarova*, 201 F.3d at 113).

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although I must "accept[ ] as true the factual allegations in the complaint and draw[ ] all inferences in the plaintiff's favor," *Biro v. Conde Nast*, 807 F.3d 541, 544 (2d Cir. 2015), I need not "accept as true legal conclusions couched as factual allegations," *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475–76 (2d Cir. 2009). When considering a motion under Rule 12(b)(6), a court may consider only (i) the complaint itself, (ii) documents either attached to the complaint or incorporated in it by reference, (iii) documents the plaintiff relied on and knew of when bringing suit, and (iv) matters subject to judicial notice. *See, e.g.*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

The principal difference between analysis under 12(b)(1) and 12(b)(6) is the extent to which I may look beyond the pleadings. In reviewing a complaint for lack of subject matter jurisdiction under Rule 12(b)(1), I may consider evidence outside the pleadings submitted by either party. *Carter v. HealthPort Techs., LLC*, 822 F.3d at 56–57 (citation omitted). In deciding a motion to dismiss under Rule 12(b)(6), on the other hand, I may only "consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).

Hempstead also moves for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). Rule 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). "Pleadings" include both the "complaint" and the "answer to [the] complaint." Fed. R. Civ. P. 7(a); *see Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021). Here, the pleadings are not closed because Hempstead has not yet filed an answer. Accordingly, its Rule 12(c) motion is premature. The Second Circuit has determined that a premature Rule 12(c) motion may be construed as a Rule 12(b)(6) motion because the motions are assessed under the same legal standard. *See Ezra v. Bristol-Myers Squibb Co.*, 784 F. App'x 48, 49 (2d Cir. 2019); *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020) ("The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that for granting a Rule 12(b)(6) motion for failure to state a claim."). Here, Hempstead concurrently moves to dismiss the Second Amended Complaint under Rule 12(b)(6). Therefore, I will address only the Rule 12(b)(6) motion to dismiss and deny Defendant's Rule 12(c) motion without prejudice.

## DISCUSSION

### I.    Ripeness

Hempstead argues that this court lacks subject matter jurisdiction because Plaintiffs' claims are not ripe. Mot. at 5–21. Considering the facts alleged in the Second Amended Complaint regarding Plaintiffs' efforts to obtain a variance to the Challenged Zoning through Hempstead's administrative process, I find that Plaintiffs' claims against Hempstead are ripe for adjudication.

Hempstead argues that a Rule 12(b)(1) jurisdictional inquiry is appropriate because ripeness implicates standing, and standing is a constitutional requirement to Article III jurisdiction. Mot. at 6–8. Ripeness is a barrier to standing because standing requires a plaintiff to have suffered an "injury in fact," *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992), and a plaintiff bringing an unripe claim has often not yet been injured. *See Congressional Rabbinical Coll. of Tartikov, Inc. v. Village of Pomona*, 945 F.3d 83, 110 (2d Cir. 2019). However, as I explained in Plaintiffs' first suit against Hempstead, "the specific ripeness requirements applicable to land use disputes are not jurisdictional." *Woodmere I*, 2022 WL 17359339, at *4 (citing *Horne v. Dep't of Agric.*, 569 U.S. 513, 526 n.6 (2013); *Sherman v. Town of Chester*, 752 F.3d 554, 561 (2d Cir. 2014)). Therefore, I apply the Rule 12(b)(6) standard to consider Defendant's ripeness argument.

In land use cases such as this one, a claim "is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson Cnty. Reg'l Plan. Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985), overruled on other grounds by *Knick v. Twp. of Scott, Pa.*, 588 U.S. 180 (2019). While the *Williamson County* ripeness prerequisite conditions "federal review on a property owner submitting at least one meaningful application for a variance," *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 348 (2d Cir. 2005), the Supreme Court has

subsequently explained that "nothing more than *de facto* finality is necessary." *Pakdel v. City and Cnty. of San Francisco*, 594 U.S. 474, 479 (2021). Once the government is "committed to a position" on a piece of land, the "finality requirement is relatively modest" and "[a]ll a plaintiff must show is that there is no question about how the regulations at issue apply to the particular land in question." *Id.* at 478–79 (alterations adopted and internal quotation marks omitted). Moreover, "[g]overnment authorities . . . may not burden property by imposition of repetitive or unfair land-use procedures in order to avoid a final decision." *Palazzolo v. Rhode Island*, 533 U.S. 606, 621 (2001).

At the time of my decision in *Woodmere I*, I concluded that Plaintiffs' claims were unripe because Plaintiffs had not submitted "at least one meaningful application for a variance," *Murphy*, 402 F.3d at 348, that would permit them to develop their property notwithstanding the terms of the Challenged Zoning. *See Woodmere I*, 2022 WL 17359339, at *6 (observing that "perhaps the zoning regulations and allowed variances will permit productive use of the property"). A variance application was necessary to ripen Plaintiffs' claims because "only if a property owner has exhausted the variance process will a court know precisely how a regulation will be applied to a particular parcel." *Murphy*, 402 F.3d at 348.

After my decision in *Woodmere I*, Plaintiffs "filed a building permit application . . . on March 10, 2023" with Hempstead seeking "use variances that would allow Plaintiffs to construct homes in areas where such development is otherwise not permitted." SAC ¶ 399. After extensive discussions with Plaintiffs about the nature and purpose of that application, Hempstead denied the use variance. *Id.* ¶ 401. Plaintiffs appealed that denial to Hempstead's zoning board of appeals. *Id.* The board of appeals scheduled a hearing on Plaintiffs' application for May 22, 2024, more than a year after the variance application was filed. *Id.* ¶ 418. However, before the date of the hearing,

11

Hempstead informed Plaintiffs that the hearing could not take place without hiring outside legal and environmental counsel to study Plaintiffs' application. *Id.* ¶ 419. The study was to be conducted at Plaintiffs' expense, and Hempstead demanded that Plaintiffs deposit $20,000 in escrow to pay for this review. *Id.* ¶¶ 420–21. Plaintiffs agreed to deposit the escrow money. *Id.* From August 2024 to September 2024, Plaintiffs proposed minor revisions to the escrow agreements but received no response from Hempstead. *Id.* ¶¶ 421–22. Finally, on September 25, 2024, Plaintiffs signed the original agreement as brought by Hempstead and deposited $20,000 with the town. *Id.* ¶ 423. After the money was deposited, no outside attorney or consultant contacted Plaintiffs. *Id.* ¶ 425. Indeed, it appears that Hempstead has taken no action on Plaintiffs' variance application, and it has not substantively responded to any follow up inquiries. *Id.* ¶¶ 426–28.

Hempstead's treatment of Plaintiffs' variance application evinces "repetitive or unfair land-use procedures to avoid a final decision." *Palazzolo*, 533 U.S. at 621. Citing the two years of procedural delay that have passed since it filed its variance application in March 2023, I agree with Plaintiffs that Hempstead has constructively denied the application by extending the appeal process and therefore "has reached a final decision as to how the portion of Plaintiffs' Property in its jurisdiction can be used." Pls.' Reply at 15–16. Although Hempstead contends that Plaintiffs' variance application was not meaningful in part because the appeal did not specify the relief sought, Mot. at 16–21, it cites no authority holding that such an application—already submitted, rejected, and at the appeal stage—is not meaningful. *Cf. BMG Monroe I, LLC v. Vill. of Monroe*, 93 F.4th 595, 604 (2d Cir. 2024) (observing that plaintiffs' premature withdrawal of their application for a variance rendered it less than meaningful). Indeed, the relief section on the appeal form appears to be optional as it states to "[o]nly answer this question with a Board staff member's

assistance at the Board's office." *See* ECF No. 89-5. Moreover, Plaintiffs allege that they "followed all procedures and requirements to receive a zoning board hearing." SAC ¶ 429.

Hempstead also argues that there has been no final decision because the town's zoning board of appeals lacks jurisdiction to consider Plaintiffs' variance application because it was not submitted lot-by-lot. Mot. at 16–18. Hempstead's argument that Plaintiffs' blanket application would result in a blanket denial only strengthens Plaintiffs' claim that the relevant government entities have committed to a final position on the Woodmere Club property. This requirement appears to be another instance of using "repetitive and unfair procedures" to avoid a final decision. *See Sherman*, 752 F.3d at 563. Moreover, Hempstead argues that Plaintiffs have not actually appealed a discrete denial from the town's building department. However, Hempstead admits that the building department communicated with Plaintiffs that "any application for a building permit for any lot within the open space . . . would require a variance." Mot. at 18. In other words, applying for a building permit without first securing a variance would have been a futile endeavor. Plaintiffs' navigation of Hempstead's administrative process conforms with common sense and Second Circuit precedent. *See Sherman*, 752 F.3d at 561 ("A property owner . . . will be excused from obtaining a final decision if pursuing an appeal to a zoning board of appeals or seeking a variance would be futile."). I find that Plaintiffs have plausibly alleged that they submitted a meaningful variance application, and that such application has been constructively denied. *See* SAC ¶¶ 418–37. Therefore, I conclude that Hempstead's treatment of Plaintiffs' variance application bears sufficient "indicia of finality" to constitute a final denial, thus rendering Plaintiffs' claims ripe. *Vill. Green at Sayville, LLC v. Town of Islip*, 43 F.4th 287, 298 (2d Cir. 2022).

Finally, Hempstead argues that Plaintiffs' claims are unripe because Plaintiffs' land use

application for a 59-lot subdivision remains pending before the Nassau County Planning Commission (NCPC). Mot. at 19–21. Just as I held in the Dismissal Order against Defendants Woodsburgh and Lawrence, that argument is unavailing. Dismissal Order at 11–12. Plaintiffs' claims against Hempstead are premised on the contention that the Challenged Zoning is unlawful because it "take[s] away Plaintiffs' ability to develop 80% of the acreage" on which Plaintiffs wish to build. SAC ¶ 5. By contrast, the 59-lot application now pending before the NCPC was specifically tailored to comply with the Challenged Zoning. *See* SAC ¶¶ 367–98. Thus, whether the NCPC approves or denies the pending application will not affect the constraints imposed by the Challenged Zoning. Either way, Plaintiffs will be permitted to develop, at most, the 59 lots "left to them" by the Challenged Zoning. *Id.* ¶ 369; *see Pakdel*, 594 U.S. at 479 (noting that "[o]nce the government is committed to a position, . . . the dispute is ripe for judicial resolution"). Indeed, the existence of the pending NCPC application when Plaintiffs first brought suit three years ago was "not dispositive of the ripeness issue." *Woodmere I*, 2022 WL 17359339, at *6 n.1. Instead, to ripen their claims, Plaintiffs needed to "exhaust[] the variance process" with the Town of Hempstead and ascertain that the challenged zoning would restrict their rights to develop the Property. *Murphy*, 402 F.3d at 348.

Given the facts alleged, I am compelled to find that Plaintiffs have availed themselves of all available opportunities to obtain administrative relief from Hempstead and that their claims are ripe for review.

## II.  Plaintiffs' Takings Claims

The Takings Clause of the Fifth Amendment to the United States Constitution provides: "nor shall private property be taken for public use, without just compensation." One of its principal purposes is "to bar Government from forcing some people alone to bear public burdens which, in

all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

Plaintiffs assert three causes of action under the Takings Clause. Their second cause of action alleges a "temporary taking," the third alleges a permanent "taking of property," and the fourth alleges an unconstitutional "exaction." *See* SAC ¶¶ 454–506. Hempstead argues for dismissal of all three of those claims. For the reasons that follow, I find that Plaintiffs have successfully made out all three of their takings claims. I therefore deny Hempstead's motion to dismiss as to Plaintiffs' second, third, and fourth causes of action.

### A. Plaintiff's Permanent Takings Claim

Plaintiffs allege, in their third cause of action, that Hempstead's actions "violate the constitutional takings clause[] both as applied and on their face." SAC ¶ 474. Defendant argues that Plaintiffs' claim fails to satisfy the three-part test for a regulatory taking established by *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104 (1978). Mot. at 21–35. Plaintiffs argue that they have sufficiently alleged all three, non-exhaustive *Penn Central* factors: 1) "[t]he economic impact of the regulation on the claimant," 2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and 3) "the character of the governmental action." *Id.* at 124; Pls.' Reply at 21. As explained below, I find that Plaintiffs have successfully alleged that Hempstead has committed an unconstitutional taking, and I therefore deny Defendant's motion as to Plaintiffs' third cause of action.

As a preliminary matter, Hempstead cites an out-of-circuit district court decision to overstate *Penn Central* as requiring Plaintiffs to plead "the loss of a Constitutionally protected property interest" and "a significant diminution in the value of their entire property approaching a near total loss." Mot. at 22. First, following my reasoning in the Dismissal Order, I reject

Hempstead's argument that Plaintiffs' takings claim fails because they "have not lost a constitutionally protected property interest." Mot. at 23–25. Plaintiffs can bring a claim for a non-categorical taking even if their right to develop does not constitute a property interest protected by the Due Process Clause. *See* Dismissal Order at 16–20, 27–28. Second, again following my analysis in the Dismissal Order, I reject the argument that Plaintiffs must plead a "near total loss" of value to bring a non-categorical regulatory takings claim. Mot. at 27–30. As I previously explained, a takings claim does not require a plaintiff to allege that the challenged taking left it "one step short" of a complete diminution in the property's economic value. *See* Dismissal Order at 18–20 (citing *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 n.8 (1992)).

As set forth below, under the proper standards, Plaintiffs have plausibly alleged facts that satisfy the three factors outlined in *Penn Central*.

Regarding the first *Penn Central* factor, "[t]he economic impact of the regulation on the claimant," 438 U.S. at 124, Plaintiffs contend that the Challenged Zoning has "made it economically unfeasible" to develop their property. SAC ¶ 483. Hempstead argues that the scope of the economic impact should concern the context of the entire Property, and that the effect of the Challenged Zoning should be examined on "the parcel as a whole." Mot. at 25–26 (citing *Penn Central*, 438 U.S. at 130–31. That is true. However, Hempstead, while quoting a district court case, distorts the language of the Second Circuit's decision in *Sherman* to suggest that every single square inch of the Property must be rendered unusable. Hempstead writes:

> The economic impact . . . can only qualify as a regulatory taking if it 'effectively prevented [Plaintiffs] from making any economic use of [*their entire*] property.' *Sherman v. Town of Chester*, [supra, 752 F.3d at 565] . . . (2d Cir. 2014).

Mot. at 25 (emphasis in original) (quoting *Elmsford Apt. Associates, LLC v. Cuomo*, 469 F. Supp. 3d 148, 165 (S.D.N.Y. 2020)). However, the original language in *Sherman* and *Elmsford*

does not suggest that a regulatory taking must affect the "entire" property. Instead, the cases analyze a regulatory taking claim based on a regulation's economic effect on a property "as a whole." *Elmsford*, 469 F. Supp 3d at 165 (citing *Penn Central*, 438 U.S. at 130–31). The proper inquiry is not whether the Challenged Zoning prohibits economic use of every square inch of the Woodmere Club property. Instead, a regulatory taking claim is based on the Challenged Zoning's aggregate impact on the Property.

Hempstead also argues that Plaintiffs have failed to allege that the Challenged Zoning resulted in a "complete loss in value." Mot. at 26–30; Def.'s Reply at 4. However, the facts alleged in the Second Amended Complaint suggest that Hempstead's "actions effectively prevented [Plaintiffs] from making any economic use of [the] property." *Sherman*, 752 F.3d at 565. The Challenged Zoning requires approximately 65% of the Property located within Hempstead to be used as parkland (which has no economic value) or as a golf course (under which the Property currently operates at an extensive loss). SAC ¶¶ 274–77. The Challenged Zoning permits Plaintiffs to build residences in the remaining 35% of the Property located within Hempstead, but those parcels are located "almost exclusively in areas of the property that lie within a flood zone," and are therefore economically unfeasible to develop. *Id*. ¶¶ 8, 296. Based on the restrictions imposed by the Challenged Zoning alleged in the Second Amended Complaint, I find that Plaintiffs have satisfied the first *Penn Central* factor.

The second *Penn Central* factor looks to "the extent to which the regulation has interfered with distinct investment-backed expectations." 438 U.S. at 124. Plaintiffs allege that their pre-purchase analysis of the Property "confirmed that, prior to the rezoning at issue in this action," their plan to develop 284 single-family residences could "be created in complete conformity with the existing zoning regulations, without the need to obtain any zoning variances." SAC ¶ 140.

17

After that analysis was completed, but prior to Plaintiffs' purchase of the Property, Hempstead enacted "temporary" moratoria on residential development, which were repeatedly renewed after Plaintiffs took title to the Property. *Id.* ¶¶ 155, 169. Hempstead argues that Plaintiffs' expectation to build residential housing was unreasonable because Plaintiffs purchased the Property "in the face of [Hempstead]'s then ongoing moratorium and announced plans to consider the adoption of stricter zoning." Mot. at 34.

Hempstead's argument is meritless. Plaintiffs took title subject to a *temporary* moratorium that was set to expire in 180 days, but which Hempstead then repeatedly renewed after Plaintiffs took title. SAC ¶¶ 141–173. Plaintiffs could not possibly predict that the Challenged Zoning, enacted in 2020—*three years* after they purchased the Property in 2017—would restrict "more than 90% of the lots available for development." *Id.* ¶¶ 258, 288. Plaintiffs, at the very least, expected "to get the Town's approval on at least some form of development." *Sherman*, 752 F.3d at 565. Moreover, "[i]t would be illogical, and unfair, to bar a regulatory takings claim because of the post-enactment transfer of ownership where the steps necessary to make the claim ripe . . . could not have been taken, by a previous owner." *Palazzolo*, 533 U.S. at 628. Even if the temporary moratorium provided notice that Hempstead would enact some form of zoning reclassification, the prior owner of the Property plainly could not have ripened a claim against the Challenged Zoning as it was enacted after Plaintiffs purchased the Property.

To the third *Penn Central* factor, "the character of the governmental action," 438 U.S. at 124, Plaintiffs argue that they have alleged the "wrongful nature of the Municipalities' regulatory actions," Pls.' Reply at 25–26, and that these results were carried out "intentionally." SAC ¶ 483. The Second Circuit in *Sherman* found that the singling out of a single proposed development with "red tape" constituted conduct that was "unfair, unreasonable, and in bad faith," and that such

conduct "falls safely" within the "character factor." 752 F.3d at 565–66 (quotation marks omitted). Plaintiffs have satisfied this standard, as the Challenged Zoning has "Woodmere" in its name and is solely applicable to Plaintiffs' property, despite the existence of many other similarly situated properties within Hempstead. SAC ¶ 2. Hempstead responds that its rationale for enacting the Challenged Zoning—flood mitigation and wildlife conservation—was a permissible "public program adjusting the benefits and burdens of public life." *Sherman*, 752 F.3d at 565. However, Hempstead's supposed purpose is contradicted by the Challenged Zoning, which allegedly permits Plaintiffs to develop residences "almost exclusively in areas of the Property that lie within a flood zone" while "prohibit[ing] development in parts of the Property that are not within a flood zone." SAC ¶ 296.

For the reasons above, I conclude that Plaintiffs have made out an unconstitutional taking claim, and I therefore deny Hempstead's motion to dismiss as to Plaintiffs' third cause of action.

### B. Plaintiffs' Temporary Takings Claim

In addition to their permanent takings claim, Plaintiffs seek in their second cause of action "damages from Defendants compensating Plaintiffs for the temporary taking . . . of Plaintiffs' Property." SAC ¶ 471 (citing *First English Evangelical Lutheran Church v. Los Angeles Cnty.*, 482 U.S. 304 (1987)). Although Hempstead moves to dismiss all of Plaintiffs' takings claims, Plaintiffs note that "[t]he Town does not appear to address Plaintiffs' takings claim for undue delays in its memorandum." Pls.' Reply at 19. In some sections of its briefing, Hempstead incorrectly suggests that Plaintiffs' second cause of action was dismissed in my previous order. Def.'s Reply at 1. At other points, Hempstead argus that Plaintiffs' temporary takings claim fails because the "fundamental elements" of temporary takings claims are the same as permanent takings claims, and Plaintiffs fail to allege a permanent takings claim. Mot. at 4.

Although Hempstead is correct that temporary and permanent takings claims are evaluated under similar standards, as discussed above, Plaintiffs have plausibly alleged a permanent taking. Plaintiffs' claim for a temporary taking presumably anticipates the possibility that the challenged zoning ordinances could be held invalid, thus turning the alleged permanent taking of Plaintiffs' land into a temporary one. In *First English*, the Supreme Court held that "'temporary' regulatory takings which, as here, deny a landowner all use of his property, are not different in kind from permanent takings, for which the Constitution clearly requires compensation." 482 U.S. at 318. Thus, if the government effects a taking, the Takings Clause "requires that the government pay the landowner for the value of the use of the land during this period," even if the taking is ultimately reversed, by judicial action or otherwise. *Id.* at 319.

In the event the challenged zoning is ultimately invalidated as a taking, Defendants will be required to compensate Plaintiffs for the temporary taking up until that date. *See First English*, 482 U.S. at 321 ("[W]here the government's activities have already worked a taking of all use of property, no subsequent action by the government can relieve it of the duty to provide compensation for the period during which the taking was effective."). I find that Plaintiffs have successfully made out their claim for a temporary taking. Therefore, I deny Hempstead's motion to dismiss Plaintiffs' second cause of action.

### C. Plaintiffs' Exaction Claim

Plaintiffs allege in their fourth cause of action that Hempstead has imposed an unconstitutional "condition" or "exaction" on Plaintiffs by requiring them to set aside most of the Property as open space to "develop[] what remains of the Property." SAC ¶ 500; *see also id.* ¶¶ 493–506. Hempstead argues that the Challenged Zoning cannot be an exaction because it is "a general requirement imposed through legislation" and not an "individualized requirement" to grant

property rights to the public in exchange for approving property development. Mot. at 35–36. Primarily relying on *Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987) and *Dolan v. City of Tigard*, 512 U.S. 374 (1994), Hempstead's argument ignores the last two decades of Supreme Court analysis clarifying the scope of *Nollan* and *Dolan*. As explained below, because Plaintiffs have pled a plausible exaction claim, I deny Hempstead's motion to dismiss Plaintiffs' fourth cause of action.

Hempstead first argues that *Dolan* and *Nollan* stand for the proposition that an exaction cannot take the form of a denial of development, and can only be applied when a government puts conditions on approval of development. Mot. at 36; Def.'s Reply at 8–9. Defendant's argument was squarely rejected by the Supreme Court in *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606 (2013). There, the Court clarified that "[t]he principles that undergird . . . *Nollan* and *Dolan* do not change depending on whether the government approves a permit on the condition that the applicant turn over property or denies a permit because the applicant refuses to do so." *Id.* In other words, Hempstead's requirement that Plaintiffs operate a park at public expense may be an exaction regardless of whether it is a condition of approval or a basis for denial of Plaintiffs' variance application. *Id.* at 607.

Hempstead further argues that the Challenged Zoning cannot be an exaction because it was a "general requirement imposed through legislation" and not individually targeted. This argument, too, was rejected by the Supreme Court. In *Sheetz v. Cnty. of El Dorado, California*, 601 U.S. 267, 279 (2024), the Court unanimously held that "there is no basis for affording property rights less protection in the hands of legislators than administrators," and "[t]he Takings Clause applies equally to both." Although the concurring opinions in *Sheetz* note that it remains an open question whether generalized requirements on many parties can constitute a taking, the facts of this case

suggest that the Challenged Zoning was individually targeted at Plaintiffs. Indeed, the legislation has "Woodmere" in its name and is solely applicable to Plaintiffs' property. SAC ¶ 331.

I find that Plaintiffs have sufficiently alleged a claim of unconstitutional exaction. The Supreme Court held in *Koontz* that "the government may choose whether and how a permit applicant is required to mitigate the impacts of a proposed development, but it may not leverage its legitimate interest in mitigation to pursue governmental ends that lack an essential nexus and rough proportionality to those impacts." 570 U.S. at 606. Plaintiffs' complaint alleges that, by adopting the Challenged Zoning, Hempstead required Plaintiffs to incur costs related to flood mitigation responsibilities that other properties are not subject to. SAC ¶¶ 52–54. The Challenged Zoning requires Plaintiffs to maintain 80 acres of undevelopable open space—"parkland"—"solely for the benefit of the residents living within the vicinity of Plaintiffs' property and not for themselves." SAC ¶ 481. The Second Amended Complaint alleges that Hempstead is "forcing Plaintiffs to maintain over 70% of the Property to achieve conservation purposes for the public at Plaintiffs' sole cost." *Id.* ¶ 496. Plaintiffs further allege that these requirements have been imposed as "a condition on developing what remains of the Property." *Id.* ¶ 500. Thus, Plaintiffs have alleged that Hempstead imposed on them "an obligation to spend money" in exchange for the right to develop their property, which, as the Supreme Court has held, constitutes a so-called "monetary exaction[]" that can support a takings claim. *Koontz*, 570 U.S. at 612. At this stage of the case, Plaintiffs' factual allegations are sufficient to suggest that there is no "nexus and rough proportionality between the government's demand and the effects of the proposed land use." *Id.* at 599 (internal quotation marks omitted).

Defendant's motion to dismiss Plaintiffs' fourth cause of action is denied.

### III.    Plaintiffs' Other Claims

Hempstead also moves to dismiss the claims brought under Plaintiffs' first, fifth, sixth, seventh, eighth, ninth, and tenth causes of action, on the basis that those claims were previously dismissed as to Defendants Lawrence and Woodsburgh and were realleged by Plaintiffs in the Second Amended Complaint only to protect their appellate rights. Mot. at 2. As stated in footnote four of the SAC, Plaintiffs acknowledged my prior order dismissing their first, fifth, sixth, ninth, and tenth causes of action, and explained that they reasserted those claims against the municipal defendants only for purposes of preserving their rights on appeal. SAC at 87 n.4.

However, footnote four of the Second Amended Complaint does not mention Plaintiffs' seventh and eighth causes of action. While I previously dismissed the claims brought under Plaintiffs' first, fifth, sixth, ninth, and tenth causes of action with prejudice as to Defendants Lawrence and Woodsburgh, I dismissed the seventh and eighth causes of action without prejudice and granted Plaintiffs leave to amend.[1] Dismissal Order at 24–27, 29. Therefore, I may consider the seventh and eighth causes of action against Hempstead.

Plaintiffs' seventh and eighth causes of action allege that the Challenged Zoning was an

---

[1] The Dismissal Order did not reach arguments raised by Defendants Lawrence and Woodsburgh that Plaintiffs' *ultra vires* claim was untimely because it was subject to a four-month statute of limitations under *P & N Tiffany Properties, Inc. v. Vill. Of Tuckahoe*, 33 A.D.3d 61 (2d Dep't 2006). ECF No. 37-7 at 40; ECF No. 40-1 at 18–19. However, it appears that a six-year, not four-month, statute of limitations applies to Plaintiffs' claims.

*P & N Tiffany* observed that a four-month statute of limitations applies when a zoning challenge is brought pursuant to CPLR article 78. The New York Court of Appeals has observed that a CPLR article 78 proceeding is "usually not available to challenge a legislative act such as a zoning ordinance" but is maintainable when it is directed "not at the substance of the ordinance but at the *procedures* followed in its enactment." *Id.* at 63–64 (emphasis added). Here, the six-year "catch-all" provision of CPLR 213(1) would apply to Plaintiffs' claims because it challenges the "substance" or "constitutionality" of the Challenged Zoning, and not the procedure by which it was enacted. *Id.*

ultra vires application of the zoning power because it "exceed[ed] the proper limits of the zoning power," SAC ¶ 539, and was "an improper effort to enact landmarking legislation through the guise of zoning," *id.* ¶ 546. Under New York law, a local government's exercise of its zoning power, "to the extent that it is lawful, must be founded upon a legislative delegation to so proceed, and in the absence of such a grant will be held *ultra vires* and void." *Golden v. Plan. Bd. of Town of Ramapo*, 30 N.Y.2d 359, 370 (1972). I previously dismissed these claims as to Lawrence and Woodsburgh because Plaintiffs failed to allege that they had served a notice of claim in compliance with New York procedural requirements for claims brought against municipalities. Dismissal Order at 24–26; N.Y.C.P.L.R. 9802 (McKinney 2024); *Hardy v. New York City Health & Hosp. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999) ("[F]ederal courts entertaining state-law claims against . . . municipalities are obligated to apply the [state] notice-of-claim provision.").

On October 22, 2024, Plaintiffs filed a letter advising the court that Plaintiffs had in fact timely served the required statutory notices of claim on Lawrence and Woodsburgh, but failed to plead as such, and requested to amend the complaint accordingly. ECF No. 51. Ultimately, Lawrence and Woodsburgh agreed to stipulate to Plaintiffs filing an amended complaint alleging timely service of the statutory notices. ECF No. 58. I approved the stipulation on November 7, 2024. ECF No. 59. Plaintiffs then filed their First Amended Complaint, which properly alleged compliance with the notice requirements. *See* ECF No. 60 ¶¶ 96–97. In support of the seventh and eighth causes of action, Plaintiffs' Second Amended Complaint similarly alleges compliance with New York's notice of claim requirements as to Hempstead. SAC ¶¶ 123–24. Offering no substantive reasoning and citing no relevant caselaw on why these claims fail, Hempstead has waived its argument against the insufficiency of Plaintiffs' *ultra vires* claims. Therefore, I deny Hempstead's motion to dismiss as to Plaintiffs' seventh and eighth causes of action.

**CONCLUSION**

For the foregoing reasons, I DENY Hempstead's motion to dismiss as to Plaintiffs' claims brought under the second, third, fourth, seventh, and eighth causes of action. Following my reasoning in the previous Dismissal Order, Plaintiffs' claims under the first, fifth, sixth, ninth, and tenth causes of action are dismissed with prejudice as to Hempstead.

The pending motion for extension of time to file an updated status report and stay all pending deadlines in this action is denied as moot. The parties are ordered to schedule a conference, to be held no later than July 15, 2025, with Magistrate Judge Anne Y. Shields to discuss the commencement of discovery.

SO ORDERED.

                                                             /s/
                                                 Allyne R. Ross
                                                 United States District Judge

Dated: June 12, 2025
       Brooklyn, New York